UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CEDRIC M. BROWN, ALFREDO L. CASULA
ANPUNEZ, ROBERT A. CHAPMAN, MARIA
CHAPMAN, HAYDEN CHAPMAN, KAYLA
CHAPMAN, BROOK A. COLBERT, JOSHUA W.
FISHER, TERRY D. FLOOD, TERRY FLOOD
JR., C.F., a minor, by her father and next friend
TERRY D. FLOOD, E.F., a minor, by his father and
next friend TERRY D. FLOOD, OREN D.
GINGRICH, FABRICIO GONZALEZ, WAYNE C.
HERMANCE, DEBORAH HERMANCE, RYAN
HERMANCE, MELISSA HERMANCE, PIERRE
L. JONES, ROGER A. LOBATO, K.L., a minor, by
her father and next friend ROGER A. LOBATO,
MICHAEL S. NIMTZ, DANNY T. PERRY JR.,
DAVID RAMIREZ, EDDIE L. RAMOS SANTA,
JUSTIN L. SHELLHAMMER, A.S., a minor, by
her father and next friend, JUSTIN L.
SHELLHAMMER, DANIEL C. SHEPHERD JR.,
LONNIE J. TURNEY, BRANDON TURNEY,
CHRISTINE TURNEY, JOSEPH TURNEY,
OMAR G. VAZQUEZ CORDERO, SUZANNE W.
WALLACE, ALLEN P. WALLACE, STACEY A.
ROCHESTER, TRELAIN ALLEN WHITING,

     Plaintiffs,

     V.

ISLAMIC REPUBLIC OF IRAN,

     Defendant.

CASE NO. 1:21-cv-1308

## **COMPLAINT**

1.     This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C.

§1605A (hereinafter "FSIA"), for personal injury and related torts on members of the U.S. armed

forces (as defined in 10 U.S.C. §101) and their families.

2.     On January 19, 1984, the United States officially designated the Islamic

Republic of Iran ("Iran") a State Sponsor of Terrorism, pursuant to §6(j) of the Export

Administration Act, §40 of the Arms Export Control Act, and §620A of the Foreign Assistance Act.

3.    Iran's agents included the U.S.-designated Foreign Terrorist Organization (see 8 U.S.C. §1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah; the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist; the Taliban; al Qaeda; and other terrorist agents that included a litany of Iraqi Shi'a terror groups and Taliban terror groups referred to herein collectively as "Special Groups."

4.    The United States designated Hezbollah a Specially Designated Terrorist on January 25, 1995, a Foreign Terrorist Organization on October 8, 1997, and a Specially Designated Global Terrorist on October 31, 2001 pursuant to E.O. 13224.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees, and agents.

6.    28 U.S.C. §1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, including its officials, employees or agents while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts.

7.    Venue is proper in this district pursuant to 28 U.S.C. §1391(f).

## THE DEFENDANT

8.    At all relevant times to this Complaint, Defendant Iran has been a foreign state within the meaning of 28 U.S.C. §1603 and designated a State Sponsor of Terrorism pursuant to §6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405(j)).

9.    Iran provided material support and resources for the commission of acts of extrajudicial killing or injury, within the meaning of 28 U.S.C. §1605A, including the terrorist attacks in which Plaintiffs, and their family members, were killed, injured or maimed.

10.    The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture and hostage takings, particularly through its Islamic Revolutionary Guard Corps and its Lebanese proxy, Hezbollah.

11.    IRGC is nominally comprised of five branches, Ground Forces, Air Force, Navy, Basij militia, and IRGC-QF, in addition to a counterintelligence directorate and representatives of the Supreme Leader. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

12.    According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

13.    The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade Explosively Formed Penetrators ("EFPs"), anti-tank guided missiles, and various rockets, such as the Fajr-5.

14.    EFPs are devices professionally manufactured and specifically designed by Iran and its agents to target U.S. and Coalition Forces' armor.  These sophisticated explosives employ a shaped copper penetrator that is an identifier of these Iranian devices.

15.    Though bombs called "improvised explosive devices" ("IEDs") are also more broadly used in the terror attacks, EFPs are a special subset of similar but more deadly weapons that are manufactured by Iran.

16.    In October 2007, the IRGC-QF was designated a Specially Designated Global Terrorist ("SDGT") pursuant to E.O. 13324 for its terrorism-related activities. The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hezbollah [sic]'s military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah [sic] in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah [sic] fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah [sic] and has assisted Hezbollah [sic] in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

### IRAN'S MATERIAL SUPPORT TO ACTS OF TERRORISM IN IRAQ AND AFGHANISTAN

17.    Through its provision of terrorist fighters, weapons, funding and training, Iran provides material support or resources for terrorist attacks in Iraq and Afghanistan facilitating attacks by its agents in those regions, increasing their terrorist capabilities and making their attacks more harmful to victims.

### A.    IRGC-QF FORCE IN IRAQ

18.      Even before the U.S. invasion of Iraq in 2003, the IRGC-QF had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps that was headquartered in Iran throughout Iraq in the 1990s.

19.      During that time, the Badr Corps smuggled men and weapons into Iraq to conduct attacks against the Hussein regime.

20.      Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

21.      After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

22.      Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

23.      Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004-2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs and EFPs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led Kata'ib Hezbollah.

24.      "Department 1000" of the IRGC-QF, known as the Ramezan Corps, was in charge of Iraq operations and remains the largest Qods Force command outside of Iran.  It coordinated, armed and influenced the Badr Organization.

   **B.     SHI'A "SPECIAL GROUPS"**

25.      In addition to its coordination with the Badr Organization, the Ramezan Corps also cultivated, armed, trained, and supported several Shi'a terror groups in Iraq that the U.S. military later termed "Special Groups."

26.      These Special Groups, which receive funding, training and weapons from Iran or

its agents include:  Jaysh al Mahdi, the Promised Day Brigades, Kata 'ib Hezbollah, and Asa'ib Ahl al-Haq ("League of the Righteous").

27.    Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups operations in Iraq.

28.    A segment of senior Special Groups commanders such as Al-Muhandis are, or were, initially Badr Corps personnel.

29.    President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

30.    On May 23, 2003, the Coalition Provisional Authority disbanded the Iraqi military forces.

31.    The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability." S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

32.    Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the peacekeeping efforts in Iraq as a potential threat to its regime.

33.    Rather than engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

34.    After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization.

35.     Although a June 7, 2004 U.N. Security Council Resolution (S.C. Res. 1546, U.N. Doc. S/RES/1546) expressly assigned Coalition Forces in Iraq the task of helping Iraq "*by preventing and deterring terrorism*," Iran set out to target Coalition Forces and force them out of Iraq.

36.     From October 16, 2003 onward, Iran embarked on a policy of terrorism, murder, kidnapping, and torture to thwart U.S. Military peacekeeping efforts.

37.     Iran opposed peacekeeping efforts and initiated acts of international terrorism against U.S. military personnel, Coalition Forces and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

38.     Iran, through its authorized agents and instrumentalities acting within the scope of their employment, agency and direction from Iran, provided material support and/or resources that facilitated acts of torture, extrajudicial killing, and hostage taking that caused personal injury or death to thousands of Americans in Iraq.

39.     In particular, Iranian agents developed and cultivated these Shi'a Special Groups, providing training in the use of IEDs, EFPs, Improvised Rocket Assisted Munitions, rocket-propelled grenades, sniper fire, mortars, and operational and computer security.

### C.     SUPPORT OF AL QAEDA AND THE TALIBAN.

40.     Iran has long served as a co-conspirator with al Qaeda. According to the United States Department of the Treasury ("Treasury Department"), Iran has been "a critical transit point for funding to support [al Qaeda's] activities in Afghanistan and Pakistan." Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point (July 28, 2011), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

41.     Up through and even after the attacks described herein, according to the Treasury

Department, Iran "serve[d] as the core pipeline through which [al Qaeda] move[d] money, facilitators and operatives from across the Middle East to South Asia," working with terrorists such as "Ali Hasan 'Ali al-;Ajmi" who provides financial and facilitation support to al Qaeda and the Taliban." *Id.*  This Iranian operative also supported al Qaeda by "facilitating travel for individuals associated with the group so that they could take part in fighting in Afghanistan."  *Id.*

42.    The Helmand Province of Afghanistan was considered critical in the conflict, and a steady flow of fighters moved from Iran into an area of northern Helmand.

43.    Iran provided al Qaeda leaders with various forms of aid and support, including false travel documents, safe harbor, communications technology, training (including small unit tactics, small arms training, explosives and indirect fire weapons training), weapons, financing, and even anti-drone technology.

44.    Iran has also actively arranged weapons shipments to al Qaeda through the Taliban since at least 2006. These weapons include small arms and ammunition, rocket propelled grenades, mortar rounds, 107 mm rockets, and EFPs.

45.    In addition to these weapons, Iran has provided al Qaeda with plastic explosives and with training in the construction of sophisticated explosive devices for use against Americans in Iraq and Afghanistan.

46.    On March 9, 2011, it was reported that British special forces in Afghanistan intercepted an Iranian shipment of rockets to the Taliban, indicating direct support of Taliban forces by Iran.  Forty-eight 122mm rockets with a range of more than 12 miles, more than double the range of the usual Taliban weapons, were found.  Of the rockets, Britain's foreign secretary stated "I am extremely concerned by the latest evidence that Iran continues to supply the Taliban with weaponry – weapons clearly intended to provide the Taliban with the capability to kill Afghan

and Isaf soldiers." "British special forces seize Iranian rockets in Afghanistan," Borger and Norton-Taylor, *The Guardian*, 3-9-2011.

### D.    EXPLOSIVELY FORMED PENETRATORS

47.    One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of and injuries to U.S. citizens in Iraq was the financing, manufacturing and deployment of EFPs.

48.    EFPs constitute "weapons of mass destruction" under 18 U.S.C. §2332a(2)(A).

49.    First used by Hezbollah against Israeli armor in Lebanon, EFPs are known as shaped charges, usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

50.    In Iraq, EFPs were often triggered by a passive infra-red device that set off the explosion within the EFP's casing, forcing the copper disk forward and turning it into a high velocity slug that could pierce most military-grade armor.

51.    To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

52.    EFPs are far more sophisticated than homemade explosive devices such as traditional IEDs, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

53.    Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005, the official identification of *specific* attacks as EFP attacks was not first publicly

disclosed until 2010.

54.     In 2006, the U.S. State Department's Country Reports on Terrorism further

documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder

U.S. and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the
> increasing lethality of anti-Coalition attacks by providing Shia militants
> with the capability to build IEDs with explosively formed projectiles
> similar to those developed by Iran and Lebanese Hezbollah [sic]. The
> Iranian Revolutionary Guard was linked to armor-piercing explosives
> that resulted in the deaths of Coalition Forces. The Revolutionary
> Guard, along with Lebanese Hezbollah [sic], implemented training
> programs for Iraqi militants in the construction and use of sophisticated
> IED technology. *These individuals then passed on this training to
> additional militants in Iraq.* (emphasis added.)

55.     Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for

Strategic Operations of the Multi-National Force – Iraq, stated: "Iran is definitely a destabilizing

force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some

of these Shi'a extremist groups and also providing advanced IED technology to them, and there's

clear evidence of that."

56.     Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah

operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence
> officials to piece together the Iranian connection to terrorism in Iraq
> […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards,
> is training, funding and arming the Iraqi groups. […] It shows how
> Iranian operatives are using Lebanese surrogates to create Hezbollah-
> like capabilities. And it paints a picture of the level of effort in funding
> and arming extremist groups in Iraq…. The groups operate throughout
> Iraq. They planned and executed a string of bombings, kidnappings,
> sectarian murders and more against Iraqi citizens, Iraqi forces and
> coalition personnel. They receive arms -- including explosively formed
> penetrators, the most deadly form of improvised explosive device -
> - and funding from Iran. They also have received planning help and
> orders from Iran.

57.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers -- IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (emphasis added.)

58.    According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)- Qods Force, continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train- the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

59.    Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

> Iranian Islamic Revolutionary Guard Corps - Qods Force (IRGC- QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that Iran will cease lethal aid.

60.     These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan …
>
> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti- Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

**E.     IMPROVISED ROCKET ASSISTED MUNITIONS (IRAMs)**

61.     Along with EFPs, IRAMs were a signature weapon of Shi'a militias in Iraq that were supplied by the IRGC.

62.     An IRAM is a rocket-fired improvised explosive device made from a large metal canister – such as a propane gas tank – filled with explosives, scrap metal and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

63.     According to The Joint Improvised Explosive Device Defeat Organization (JIEDDO) of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

64.    Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of *specific* attacks as IRAM attacks was not publicly disclosed until 2010.

65.    IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

66.    All of the foregoing support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated in substantial part by material support in the form of funds transfers initiated by Iran through Iranian banks on behalf of and for the benefit of Hezbollah and other agents of Iran's IRGC.

## THE PLAINTIFFS

### A.    The Cedric M. Brown Attack

67.    Cedric M. Brown was a citizen of the United States domiciled in Florida when he was injured in Iraq.

68.    From July of 2010 to July of 2011, Army Private Brown was serving in the U.S. military in Iraq when he was injured during an attack.

69.    Sometime around November of 2010, Private Brown and as part of Charlie Company 1-14, 25th Infantry Division, was the gunman in a Stryker vehicle that was in a four-vehicle convoy on a clearing mission in, or around Kirkuk, Iraq when the Stryker vehicle which Private Brown in, was hit by an IED explosion, and as a result Private Brown sustained shrapnel wounds to his face, and injuries to his back, shoulders, and wrist as he was hanging out of the gunner's hatch on the Stryker.

70.    Subsequently, Private Brown was diagnosed with PTSD and a knee condition related to the attack.

71.     Private Brown was awarded 60% disability from the Veterans Administration as a result of his injuries.

72.     The attack that injured Private Brown was facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

73.     As a result of the attack and the injuries he suffered, Private Brown has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**B.     The Alfredo J. Casula Antunez Attacks**

74.     Alfredo J. Casula Antunez was a citizen of the United States domiciled in Texas when he was injured in Iraq.

75.     From June of 2004 to May of 2005, Marine Corps. Lance Corporal Casula Antunez was serving in the U.S. military in Iraq when he was injured during attacks.

76.     During Lance Corporal Casula Antunez's time in Iraq, he was an Infantryman with Company A, 1st Battalion, 23rd Marines, 4th Marine Division, and was involved in several attacks in or around Hit, Turaybil, Ar Rutba, and Mahadami, Iraq.

77.     Sometime around August of 2004, Lance Corporal Casula Antunez's unit was part of a convoy operating in, or around Ar Rutbah, Iraq when the convoy was hit with an IED explosion.

78.     Sometime around October 4, 2004, Lance Corporal Casula Antunez's unit was tasked with securing a cordon on the location along the Euphrates River in Hit, Iraq when his unit came under attack by mortars, RPGs, grenades, and IEDs.

79.     Sometime around December of 2004, Lance Corporal Casula Antunez's unit was operating in, or around Turaybil, Iraq when they came under attack by RPGs, and IEDs.

80. Sometime around January of 2005, Lance Corporal Casula Antunez's unit was part of another convoy operating in, or around Mahadami, Iraq when the convoy was hit with another IED explosion.

81. Subsequent to the attacks, Lance Corporal Casula Antunez was diagnosed with a PTSD, a traumatic brain injury, tension headaches, knee conditions, IBS, and tinnitus related to the attacks.

82. Lance Corporal Casula Antunez was awarded 100% disability from the Veterans Administration as a result of his injuries.

83. The attacks that injured Lance Corporal Casula Antunez were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

84. As a result of the multiple attacks and the injuries he suffered, Lance Corporal Casula Antunez has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**C.    The Robert A. Chapman Family**

85. Robert A. Chapman was a citizen of the United States domiciled in Texas when he was injured in Iraq.

86. From July of 2005 to December of 2006, Robert Chapman was a U.S. Department of Justice employee assigned to work at the U.S. Embassy in Baghdad, Iraq, and held the positions of a Supervisor Contract Specialist, Federal Law Enforcement Officer, and Special Deputy U.S. Marshall.

87. While assigned to the U.S. Embassy in Baghdad, Iraq, Mr. Chapman was charged with providing security, prisoner escort, and witness protection services on behalf of the U.S. Department of Justice.

88.    As Robert Chapman was providing such services for the U.S. Department of Justice, they were constantly coming under attack by RPGs, Rockets, Mortars, and small arms fire.

89.    As part of Mr. Chapman's job duties, he was often required to provide security/escort services at prisoner trials, including the trial of Saddam Hussain in Baghdad, Iraq where they were constantly coming under attack by RPGs, Rockets, Mortars, and small arms fire.

90.    In addition, Mr. Chapman was often required to provide security/escort services in the transportation of prisoners between the U.S. Embassy in Baghdad to Kurdistan, Iraq by helicopter which were constantly coming under attack by RPGs, Rockets, Mortars, and small arms fire.

91.    Subsequently, Robert Chapman was diagnosed with PTSD related to the numerous attacks.

92.    Robert Chapman was awarded 100% disability from the Department of Justice, Office of Personnel Management as a result of his injuries.

93.    The attacks that injured Robert Chapman were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

94.    As a result of the multiple attacks and the injuries he suffered, Robert Chapman has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

95.    Plaintiff Maria Chapman is Robert Chapman's wife who was married to Robert prior to Robert's service in Iraq, and Plaintiffs Hayden Chapman and Kayla Chapman are their adult children that were born prior to Robert's service in Iraq.

96.    As a result of the attacks and the injuries to Robert Chapman, Plaintiffs Maria

Chapman, Hayden Chapman, and Kayla Chapman have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband's or father's society, companionship, comfort, advice and counsel.

     **D.**   **The Brook A. Colbert Attacks**

97.     Brook A. Colbert was a citizen of the United States domiciled in Louisiana when he was injured in Iraq.

98.     From April of 2003 to April of 2004, March of 2005 to January of 2006, and then May of 2008 to May of 2009, Army Sergeant Colbert was serving in the U.S. military in Iraq when he was injured during attacks.

99.     From April of 2003 to April of 2004, Sergeant Colbert was a member of the 16th Signal Battalion, 3rd Signal Brigade serving in, or around Ramadi, Iraq, and was charged with setting up antennas and other communication equipment along the Euphrates River to establish communications for the U.S. Army.

100.     While on the subject missions, Sergeant Colbert and his unit were constantly coming under attack by terrorists that were traveling along the Euphrates River in small boats, and firing RPGs, Mortars, and small arms at them.

101.     From March of 2005 to January of 2006, Sergeant Colbert and his unit, were back in Iraq, serving in, or around Mosul, Iraq, and again was charged with setting up antennas and other communications equipment in the area to establish communications for the U.S. Army.

102.     While on the subject missions, Sergeant Colbert and his unit were constantly coming under attack by terrorists armed with RPGs, Mortars, and small arms.

103.     From May of 2008 to May of 2009, Sergeant Colbert was back in Iraq, this time with 1st Cavalry Bravo Company, stationed out of FOB Gary Owen in Amarah, Iraq.

104.     Sometime around late July or August of 2008, FOB Gary Owen came under attack

by terrorists with rockets while Sergeant Colbert and his unit were sleeping.

105.    Sometime thereafter, Sergeant Colbert was in a two-vehicle convoy that was making a "ice run" from FOB Gary Owen to the Sugar Shack around Amarah, Iraq, when the second truck that Sergeant Colbert was not in was struck by an EFP killing the gunner of the second truck.

106.    Subsequently, Sergeant Colbert was diagnosed with PTSD, sleep apnea, and tinnitus related to the attacks.

107.    Sergeant Brook Colbert was awarded 100% disability from the Veterans Administration as a result of his injuries.

108.    The attacks that injured Sergeant Colbert were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

109.    As a result of the multiple attacks and the injuries he suffered, Sergeant Brook Colbert has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**E.    The Joshua W. Fisher Attack**

110.    Joshua W. Fisher was a citizen of the United States domiciled in Florida when he was injured in Afghanistan.

111.    From April to June of 2012, Army Specialist Fisher was serving in the U.S. military in Afghanistan when he was injured during an attack.

112.    Sometime around June 28, 2012, Specialist Fisher and as part of the 110th Transportation Company, 10th Mountain Division was the top gunner in the lead vehicle in a convoy that was providing security for host nation truckers that were providing supplies around

North of Kabul, and before FOB Shank, Logar Province, Afghanistan when his vehicle ran over an IED causing the vehicle to rollover, and causing Specialist Fischer to lose consciousness, and right knee and ankle fractures.

113. Subsequently, Specialist Fisher was diagnosed with right knee and ankle injuries, adjustment disorder with mixed anxiety (PTSD), a traumatic brain injury, scarring and pain related to the attack.

114. Specialist Fischer was awarded 80% disability from the Veterans Administration as a result of his injuries.

115. The attack that injured Specialist Fischer was facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

116. As a result of the attack and the injuries he suffered, Specialist Fischer has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**F.    The Terry D. Flood Family**

117. Terry D. Flood was a citizen of the United States domiciled in North Carolina when he was injured in Afghanistan.

118. From February of 2006 to June of 2007 and then again from April to November of 2013, Army Sergeant First Class Flood was serving in the U.S. military in Afghanistan when he was injured during attacks.

119. Sometime around March of 2006, Army Sergeant First Class Flood and as part of the 3rd Brigade, 10th Mountain Division, 2-82 FA, 7th Special Forces Group was getting off a helicopter at FOB Skin in East Paktika, Afghanistan when a rocket landed five (5) meters from where he was operating thereby exposing Army Sergeant First Class Flood to the blast.

120.    Sometime around September of 2013, Army Sergeant First Class Flood and as part of the 4th Brigade, 101st Airborne Division, 4-320 FAR, attached to A1-506 was assigned to FOB Chamkani in Paktika, Afghanistan when a mortar came through the roof where he was living thereby exposing Army Sergeant First Class Flood to the blast.

121.    Subsequent to the attack, Sergeant First Class Flood was diagnosed with PTSD and a traumatic brain injuries related to the attacks.

122.    Sergeant First Class Flood was awarded 100% disability from the Veterans Administration as a result of his injuries.

123.    The attacks that injured Sergeant First Class Flood were facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

124.    As a result of the attack and the injuries he suffered, Sergeant First Class Flood has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

125.    Plaintiff Terry Flood Jr. is Sergeant First Class Flood's adult child, and C.F. is his minor child, both of which were born prior to the March of 2006 attack.

126.    Plaintiff E.F. is Sergeant First Class Flood's minor child, and in addition to Terry Flood Jr. and C.F., all were born prior to the September of 2013 attack.

127.    As a result of the attack and the injuries to Sergeant First Class Flood, Plaintiffs Terry Flood Jr., C.F., and E.F. have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their father's society, companionship, comfort, advice and counsel.

### G.    The Oren D. Gingrich Attack

128.    Oren D. Gingrich was a citizen of the United States domiciled in Michigan when he was injured in Afghanistan.

129.    From September to October of 2010, Army Corporal Gingrich was serving in the U.S. military in Afghanistan when he was injured during an attack.

130.    Sometime around October 10, 2010, Army Corporal Gingrich and as part of the 173d Airborne Brigade, BFB, Alpha Company assigned to FOB Shank in the Logar Province in Eastern Afghanistan was walking across "Hardball Utah" for guard duty at CRSP yard when a modified mortar round detonated knocking him to the ground and causing dizziness and near loss of consciousness.

131.    Subsequent to the attack, Corporal Gingrich was diagnosed with PTSD, traumatic brain injury, seizures, and disc disease related to the attack.

132.    Corporal Gingrich was awarded 100% disability from the Veterans Administration as a result of his injuries.

133.    The attacks that injured Corporal Gingrich were facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

134.    As a result of the attack and the injuries he suffered, Corporal Gingrich has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**H.    The Fabricio Gonzalez Attack**

135.    Fabricio Gonzalez was a citizen of the United States domiciled in Texas when he was injured in Iraq.

136.    From October of 2010 to November of 2011, Army Sergeant Gonzalez was serving in the U.S. military in Iraq when he was injured during an attack.

137.    Sometime around August of 2011, Sergeant Gonzalez and as part of the 370th

21

Transportation Company out of Brownsville, Texas, was in a convoy on MSR Tampa in, or around Baghdad, Iraq when a IED exploded in front of the vehicle that Sergeant Gonzalez was in, and thereby causing a traumatic brain injury to Sergeant Gonzalez.

138.    Subsequently, Sergeant Gonzalez was diagnosed with PTSD, traumatic brain injury, and a slap tear in his left shoulder related to the attack.

139.    Sergeant Gonzalez was awarded 90% disability from the Veterans Administration as a result of his injuries.

140.    The attack that injured Sergeant Gonzalez was facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

141.    As a result of the attack and the injuries he suffered, Sergeant Gonzalez has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**I.    The Wayne Hermance Family**

142.    Wayne C. Hermance was a citizen of the United States domiciled in North Carolina when he was injured in Iraq.

143.    From September of 2005 to April of 2006, Marine Corps. First Sergeant Wayne Hermance was serving in the U.S. military in Iraq when he was injured during attacks.

144.    Sometime around September 28, 2005, then Sergeant Hermance, and as part of the 6th Civil Affairs group, was traveling in a three-vehicle convoy coming from Saqlawia, Iraq and heading toward a Civil Military Operations Center in Fallujah, Iraq when the second vehicle in the convoy was hit by an IED which sent shrapnel into the third vehicle that Sergeant Hermance was driving.

145.    Sometime around January 19, 2006, Sergeant Hermance and his unit were at a

civilian operating center in Fallujah, Iraq for a city counsel meeting, and as his unit was departing the center, an IED detonated thereby exposing Sergeant Hermance and his unit to the blast and shrapnel from the IED detonation.

146.     Sometime around March 6, 2006, Sergeant Hermance and his unit were part of a three-vehicle convoy that was traveling from an operation in a village in the outskirts of Fallujah, Iraq in an area called "the Pocket." On the route, was a bridge spanning a section of irrigation waterway that serviced local farms. After the lead vehicle had crossed the bridge, and the second vehicle entered, an IED was detonated at the rear of the second vehicle thereby exposing Sergeant Hermance and his unit to the blast and shrapnel from the IED detonation.

147.     Subsequent to the attacks, First Sergeant Hermance was diagnosed with a spinal cord injury at L5-S1, and a traumatic brain injury related to the attacks.

148.     First Sergeant Hermance was awarded 100% disability from the Veterans Administration as a result of his injuries.

149.     The attacks that injured Sergeant Hermance were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

150.     As a result of the multiple attacks and the injuries he suffered, First Sergeant Hermance has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

151.     Plaintiff Deborah Hermance is First Sergeant Hermance's wife who was married to First Sergeant Hermance on April 22, 1989, and Ryan Hermance and Melissa Hermance are the adult children of First Sergeant Hermance who were both born prior to the attacks.

152.     As a result of the attacks and the injury to First Sergeant Hermance, Plaintiffs

Deborah Hermance, Ryan Hermance, and Melissa Hermance have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their Husband's or father's society, companionship, comfort, advice and counsel.

### J.    The Pierre L. Jones Attacks

153.    Pierre L. Jones was a citizen of the United States domiciled in Virginia when he was injured in Iraq.

154.    From March of 2005 to June of 2009, Army Specialist Jones was serving in the U.S. military in Iraq when he was injured during attacks.

155.    Sometime around March 16, 2008, Specialist Jones, and as part of the 121st Infantry Division, was on a patrol mission walking through a village around Mosul, Iraq when a remote IED was detonated thereby exposing Specialist Jones and his unit to the blast and shrapnel from the IED detonation.

156.    Sometime around May 26, 2008, Specialist Jones and his unit were on another patrol mission walking through a different village around Mosul, Iraq when another remote IED was detonated thereby exposing Specialist Jones and his unit to the blast and shrapnel from the IED detonation.

157.    Sometime around August 30, 2008, Specialist Jones was providing security for an EOD unit who was removing and detonating an IED in Baghdad, Iraq. The EOD team detonated the IED, and exposed Specialist Jones to the blast from the IED detonation.

158.    Subsequently, Specialist Jones was diagnosed with PTSD, back injuries, hearing loss, tinnitus, and lung damage related to the attacks.

159.    Specialist Pierre Jones was awarded 100% disability from the Veterans Administration as a result of his injuries.

160.     The attacks that injured Specialist Jones were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

161.     As a result of the multiple attacks and the injuries he suffered, Specialist Jones has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**K.     The Roger Lobato Family**

162.     Roger A. Lobato was a citizen of the United States domiciled in California when he was injured in Afghanistan.

163.     From September of 2010 to July of 2011, Army Specialist Lobato was serving in the U.S. military in Afghanistan when he was injured during attacks.

164.     Sometime around May 7, 2011, then Private First Class Lobato, and as part of the 109th Transportation Company, was traveling in a lead scout truck coming from dropping off a host Afghan national at FOB Sharana in the Paktika Province, Afghanistan and heading toward Bagram Airfield when a 700-1,000 pound IED detonated.

165.     During the attack, Private First Class Lobato was a gunner in the lead scout truck that was attacked with an IED.  He was injured by direct and secondary blasts in this attack. He was knocked unconscious for 5-10 minutes, suffered a traumatic brain injury, open head wound, blast injuries, and a back injury.

166.     Subsequently, he was diagnosed with PTSD, tinnitus, and Reactive Airways Dysfunction Syndrome related to the attack.

167.     Specialist Lobato was awarded 100% disability from the Veterans Administration as a result of his injuries.

168.     The attacks that injured Specialist Lobato were facilitated by the material support

and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

169.    As a result of the multiple attacks and the injuries he suffered, Specialist Lobato has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

170.    Plaintiff K.L. is Specialist Lobato's minor child that was born prior to the May 7, 2011 attack.

171.    As a result of the attack and the injuries to Specialist Lobato, Plaintiff K.L. has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her father's society, companionship, comfort, advice and counsel.

## L.    The Michael S. Nimtz Attack

172.    Michael S. Nimtz was a citizen of the United States domiciled in Minnesota when he was injured in Iraq.

173.    From 2004 to 2005, Marine Corps. Staff Sergeant Nimtz was serving in the U.S. military in Iraq when he was injured during attacks.

174.    During Marine Corps. Staff Sergeant Nimtz's time in Iraq, he was an Infantryman, Security Forces, and Platoon Sergeant with the 1st Light Armored Reconnaissance Battalion who was involved in several attacks in or around the Al Anbar Province, Iraq.

175.    Sometime during the night of August 23, 2004, Staff Sergeant Nimtz's unit was in a convoy in, or around the Al Anbar Province, Iraq when the lead vehicle of the convoy hit an IED, thereby exposing Staff Sergeant Nimtz and his unit to the blast from the IED detonation. Staff Sergeant Nimtz's unit repelled the enemy, secured area, and medevacked the injured Marines.

176.    The next morning on August 24, 2004, Staff Sergeant Nimtz's unit was tasked

with recovering and bringing back the downed vehicles from the attack the night before when the vehicle that Staff Sergeant Nimtz was in took a direct hit from an IED thereby exposing Staff Sergeant Nimtz to the blast and shrapnel to his chin and left hand from the IED. Once again, Staff Sergeant Nimtz's unit repelled the enemy, secured the area, and transported the injured Marines back to base.

177.    Subsequent to the attacks, Staff Sergeant Nimtz was diagnosed with mood disorder, migraines, tinnitus, and plantar fasciitis related to the attacks.

178.    Staff Sergeant Nimtz was awarded 60% disability from the Veterans Administration as a result of his injuries.

179.    The attacks that injured Staff Sergeant Nimtz were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

180.    As a result of the multiple attacks and the injuries he suffered, Staff Sergeant Nimtz has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**M.   The Danny T. Perry Jr. Attacks**

181.    Danny T. Perry Jr. was a citizen of the United States domiciled in Florida when he was injured in Iraq.

182.    From January of 2006 to September of 2006, and then October of 2007 to November of 2008, Army Sergeant Perry was serving in the U.S. military in Iraq when he was injured during attacks.

183.    Sometime around May of 2006, Sergeant Perry, and as part of the 101st Airborne Division, 1st of 1-502 Infantry, was on a seven (7) day mission called, "Operation Glory Light"

around Muhammadiyah, Iraq when a mortar struck the building his team was in thereby causing Sergeant Perry severe headaches from the blast of the mortar round.

184.    Sometime around April of 2007, Sergeant Perry and his unit were on "Route Sue" in Muhammadiyah, Iraq on a mission to install a clandestine cellular monitoring device when the truck that Sergeant Perry was in was hit by a controlled detonated IED. Sergeant Perry was a mounted passenger in the truck when it was hit with the IED and sustained a traumatic brain injury, shoulder injury, and back injuries from the attack.

185.    Sometime around June of 2008, Sergeant Perry and his unit traveling in Iraq around JSS Hurriah on "Route Ranger" on a "cordon mission" for a discovered IED when the truck that Sergeant Perry was in was impacted by a secondary device that was not located. The shockwave from the blast caused the gunners hatch to close on Sergeant Perry's head which resulted in injuries to his head, neck, and spine.

186.    Subsequently, Sergeant Perry was also diagnosed with PTSD related to the attacks.

187.    Sergeant Danny T. Perry Jr. was awarded 80% disability from the Veterans Administration as a result of his injuries.

188.    The attacks that injured Sergeant Perry were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

189.    As a result of the multiple attacks and the injuries he suffered, Sergeant Perry has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**N.    The David Ramirez Attacks**

190.    David Ramirez was a citizen of the United States domiciled in Florida when he

was injured in Iraq and Afghanistan.

191.    From approximately June of 2008 to 2010, David Rameriz was a civilian Logistics Coordinator employed by Kellogg, Brown, and Root, Inc. ("KBR") providing logistics services to the United States military in Iraq.

192.    From approximately 2010 to 2011, David was a civilian Logistics Manager employed by Raytheon Technical Service Co., LLC ("RTS") providing logistics services to the United States military in Iraq.

193.    In 2012, David was a civilian Logistics Analysist employed by ManTech International Corporation ("MI") providing logistics services to the United States military in Afghanistan.

194.    During David's employment with KBR, RTS, and MI David was deployed to:

(a)    Bagdad, Iraq from approximately June through July of 2008, and then August to September of 2010;

(b)    Taji, Iraq from approximately July of 2008 to January of 2009, March to August of 2010, and then March to August of 2011;

(c)    Al Asad, Iraq from approximately January of 2009 to May of 2009;

(d)    Balad, Iraq from approximately March to August of 2010;

(e)    Kalsu, Iraq from August to September of 2011; and then

(f)    Bagram, Afghanistan from February to March of 2012.

195.    During David's deployments to Iraq and Afghanistan, David was exposed to nearly daily terrorist attacks by mortars, rockets, and small arms.

196.    Sometime in June of 2008, David was inside Camp Victory in Bagdad, Iraq when a mortar exploded approximately five feet above his head thereby knocking David unconscious

and sustaining a traumatic brain injury.

197.     On or around September 24, 2008, David was on the flight line at Camp Taji in Iraq loading helicopters with materials and supplies when another mortar exploded approximately 8-10 feet from David thereby exposing him to the blast and violently shaking his body.

198.     On or around October 24, 2008, David was on the flight line at Camp Taji in Iraq loading helicopters with materials and supplies when another mortar exploded approximately 12 feet from David thereby exposing him to the blast and violently shaking his body.

199.     Sometime in July of 2010, David was inside the computer room at the recreational area on Camp Taji in Iraq when another mortar exploded near David exposing him to the blast and violently shaking his body.

200.     Subsequent to the attacks and David's employment, David was diagnosed with traumatic brain injuries, back injuries, PTSD, bipolar disorder, and schizophrenia related to the attacks.

201.     The attacks that injured David Ramirez were facilitated by the material support and resources provided by Iran to militants in Iraq and Afghanistan via Iranian-funded and -trained terror operatives in Iraq and Afghanistan.

202.     As a result of the multiple attacks and the injuries he suffered, David Ramirez has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**O.   The Eddie L. Ramos Santa Attack**

203.     Eddie L. Ramos was a citizen of the United States domiciled in Puerto Rico when he was injured in Iraq.

204.     From May of 2005 to May of 2006, Army Sergeant Ramos was serving in the

U.S. military in Iraq when he was injured during an attack.

205.    Sometime around September of 2005, Sergeant Ramos, as part of Charlie Company 1-295, and as an infantryman for 11 Bravo was on patrol in a convoy of Humvees near Fallujah, Iraq when his convoy was suddenly attacked by RPGs and a road-side bomb causing the Humvee that Sergeant Ramos was in to receive a direct hit and slamming Sergeant Ramos around the Humvee that he was in, and causing blurry vision, buzzing in his ears, and a headache.

206.    Subsequently, Sergeant Ramos was diagnosed with tinnitus, PTSD adjustment disorder, lumbar strain, and neuropathy right and left side related to the attack.

207.    Sergeant Ramos was awarded 80% disability from the Veterans Administration as a result of his injuries.

208.    The attack that injured Sergeant Ramos was facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

209.    As a result of the attack and the injuries he suffered, Sergeant Ramos has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**P.    The Justin L. Shellhammer Family**

210.    Justin L. Shellhammer was a citizen of the United States domiciled in Ohio when he was injured in Afghanistan.

211.    From March of 2005 to April 5, 2005, Army Staff Sergeant Shellhammer was serving in the U.S. military in Afghanistan when he was injured during an attack.

212.    At that time, Army Staff Sergeant Shellhammer was assigned the duty of Quick Reaction Force ("QRF") Squad Leader at the Bagram Airforce Base in Afghanistan, responding to any threat to the base.

213.    On April 5, 2005, the Bagram Airforce Base was under mortar attack, and Staff Sergeant Shellhammer and his QRF squad were tasked with locating and taking care of the mortar threat which they took 3 trucks and 12 soldiers to do. When Staff Sergeant Shellhammer's squad got to the grid where the mortars were coming from, Staff Sergeant Shellhammer and part of their squad dismounted their trucks and went down a dirt trail to locate the target. Staff Sergeant Shellhammer saw a mortar sticking out of the ground, and did a controlled halt, however two of the soldiers were not watching where they were going and bumped into Staff Sergeant Shellhammer causing him to lose his balance and step on a landmine which ended up blowing-up and causing Staff Sergeant Shellhammer to instantly lose his left leg below his knee.

214.    Subsequent to the attack, Staff Sergeant Shellhammer was diagnosed with loss of left leg, PTSD, tinnitus, and injuries to his lumbar back, right shoulder, right and left lower leg, right hip, and right and left knee related to the attack.

215.    Staff Sergeant Shellhammer was awarded 100% disability from the Veterans Administration as a result of his injuries.

216.    The attacks that injured Staff Sergeant Shellhammer were facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

217.    As a result of the attack and the injuries he suffered, Staff Sergeant Shellhammer has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

218.    Plaintiff A.S. is Staff Sergeant Shell Hammer's minor child who was born prior to the April 5, 2005 attack.

219.    As a result of the attack and the injuries to Staff Sergeant Shellhammer, A.S. has

experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her father's society, companionship, comfort, advice and counsel.

**Q.    The Daniel C. Shepherd Jr. Attacks**

220.    Daniel C. Shepherd Jr. was a citizen of the United States domiciled in South Dakota when he was injured in Iraq.

221.    From August of 2004 to July of 2005, Army Sergeant Shepherd was serving in the U.S. military in Iraq when he was injured during attacks.

222.    During Sergeant Shepherd's time in Iraq, he was an Airborne Combat Medic who was involved in approximately 12 IED attacks in or around Ramadi, Fallujah, and Habbaniyah, Iraq, and particularly on MSR Michigan between Ramadi and Fallujah, Iraq.

223.    Sometime around June of 2005, Sergeant Shepherd was providing medical aid to a pregnant local woman parked along MSR Michigan when hostels detonated multiple IEDs which threw Sergeant Shepherd across the road, knocking him unconscious and bleeding from his ears.

224.    Subsequently, Sergeant Shepherd was diagnosed with post-concussion syndrome with chronic migraine headaches, a traumatic brain injury, tinnitus, IBS, disc injury, and PTSD related to the attacks.

225.    Sergeant Shepherd was medical discharged from the Army and was awarded 100% disability from the Veterans Administration as a result of his injuries.

226.    The attacks that injured Sergeant Shepherd was facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

227.    As a result of the attacks and the injuries he suffered, Sergeant Shepherd has experienced and continues to experience severe physical and mental anguish and extreme

emotional pain and suffering.

    **R.**   **The Lonnie J. Turney Family**

228.    Lonnie J. Turney was a citizen of the United States domiciled in California when he was injured in Afghanistan.

229.    From July of 2010 to February of 2011, Navy Senior Chief Lonnie J. Turney Third Naval Construction Regiment was serving in the U.S. military in Afghanistan when he was injured during an attack.

230.    Sometime around October 29, 2010, Senior Chief Turney was walking from chow on the Kandahar Airforce Base in Kandahar, Afghanistan when a rocket hit approximately 30 meters away from him.

231.    Subsequent to the attack, it was discovered that Senior Chief Turney sustained a shrapnel wound to his right lung as a result of the attack, was also diagnosed with PTSD, leg, and hearing loss injuries related to the attack.

232.    Senior Chief Turney was awarded 80% disability from the Veterans Administration as a result of his injuries.

233.    The attacks that injured Senior Chief Turney were facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

234.    As a result of the attack and the injuries he suffered, Senior Chief Turney has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

235.    Plaintiffs Brandon Turney, Christine Turney, , and Joseph Turney are Senior Chief Turney's adult children that were born prior to the October 29, 2010 attack.

236.    As a result of the attack and the injuries to Senior Chief Turney, Plaintiffs

Brandon Turney, Christine Turney, and Joseph Turney have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her father's society, companionship, comfort, advice and counsel.

**S.    The Omar G. Vazquez Cordero Attacks**

237.    Omar G. Vazquez Cordero was a citizen of the United States domiciled in Puerto Rico when he was injured in Iraq.

238.    From July of 2006 to September of 2007, Army Corporal Vazquez Cordero was serving in the U.S. military in Iraq when he was injured during attacks.

239.    During Corporal Vazquez Cordero's time in Iraq, he was a Combat Medical Specialist (68W) with Bravo Company, 130th EN BN, and performed clearing missions in or around Bagdad, Iraq looking for IEDs.

240.    Sometime around June 15, 2007, Corpral Vazquez Cordero and his unit were performing a clearing mission on Route Aeros, around Baghdad, Iraq when the convoy stopped to interrogate a possible IED on the right side of the road, as Sergeant Vazquez Cordero's unit was waiting for EOD to arrive on scene, an RPG struck the vehicle that Sergeant Vazquez Cordero was in. Sergeant Vazquez Cordero was bleeding from his forehead as a result of the blast, but he continued to provide medical attention to the other soldiers inside the vehicle that he was in, and in the convoy until they reached COP Guerrero for medical attention.

241.    Subsequently, Corporal Vazquez Cordero was diagnosed with shrapnel wounds, tinnitus, major depressive disorder with anxious distress (PTSD), and a rash related to the attacks.

242.    Corporal Vazquez Cordero was medical discharged from the Army and was awarded 80% disability from the Veterans Administration as a result of his injuries.

243.    The attacks that injured Corporal Vazquez Cordero was facilitated by the

material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

244.    As a result of the attacks and the injuries he suffered, Corporal Vazquez Cordero has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

**T.    The Suzanne Wheeler Wallace Family**

245.    Suzanne Wheeler Wallace was a citizen of the United States domiciled in Texas when she was injured in Afghanistan.

246.    In February of 2004, Suzanne Wheeler Wallace was a civilian Construction Superintendent employed by the Lewis Berger Group building schools and health clinics in Afghanistan.

247.    On February 22, 2004, Ms. Wallace was transported by a helicopter along with four foreigners and an Afghan interpreter to a village in Thaloqan, North Eastern Afghanistan to inspect a school constructions project.

248.    As the helicopter was preparing to take off from Thaloqan, it was attacked by small arms, and RPG fire.

249.    During the attack, Suzanne Wheeler Wallace was struck three times in her torso, and once in her leg by small arms fire. The pilot of the helicopter was shot and killed, and another occupant was shot five times. A RPG also struck the gear box of the helicopter.

250.    After the attack, Suzanne Wheeler Wallace was transported for emergency surgery in Kandahar, Afghanistan, and then an American Airforce base in Kabul, Afghanistan.

251.    As a result of the attack, Ms. Wallace suffered shrapnel wounds, gun shot wounds, and scars to various parts of her body, including severe and permanent injuries to her right leg and back. Subsequently, she was diagnosed with PTSD related to the attack.

252.    The attacks that injured Suzanne Wheeler Wallace were facilitated by the material support and resources provided by Iran to militants in Afghanistan via Iranian-funded and -trained terror operatives in Afghanistan.

253.    As a result of the multiple attacks and the injuries she suffered, Suzanne Wheeler Wallace has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

254.    Plaintiff Allen P. Wallace is Suzanne Wheeler Wallace's husband who was married to Suzanne on October 19, 2002, and Plaintiff Stacy A. Rochester is their adult child that was born prior to the February 2, 2004 attack.

255.    As a result of the attack and the injuries to Suzanne Wheeler Wallace, Plaintiffs Allen P. Wallace and Stacy A. Rochester have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their wife's or mother's society, companionship, comfort, advice and counsel.

**U.    The Trelain Allen Whiting Attack**

256.    Trelain Whiting was a citizen of the United States domiciled in North Carolina when he was injured in Baqubah, Iraq.

257.    On June 24, 2004, Army Private First Class Trelain Whiting was serving in the U.S. military in Iraq when he was injured during an attack on his unit.

258.    On June 24, 2004, near the Mufrek traffic circle in western Baqubah, Iraq, U.S. troops in a convoy of Bradley Fighting Vehicles on a mission to clear IEDs were attacked. At that time, they were ambushed terrorists armed with machine gun rounds, RPGs, EFP's and a daisy chain of IEDs. A firefight ensued and additional U.S. forces were sent and participated in the action.

259.     During the attack, Private First-Class Whiting was injured by direct and secondary blasts in this attack.  He was thrown freely about inside the armored vehicle in which he was travelling, and suffered shrapnel wounds, gunshot wounds, burns, and vision loss.

260.     On August 13, 2007, now Corporal Whiting was back in Iraq with 4th Battalion, 9th Infantry Regiment, Manchus, 1st Platoon Infantry Co., Comanche Company, 2nd Infantry Division manning the 50 cal. in a striker vehicle traveling from patrol in Tarmiyah, Iraq back to Camp Taji to re-supply when the striker vehicle was attacked by a IED buried by terrorists.

261.     The blast from the IED caused Corporal Whiting to hit his head on the gunner's hatch, and then a metal screen causing him to lose consciousness.

262.     Subsequent to the attacks, Corporal Whiting was also diagnosed with PTSD, a traumatic brain injury, and hearing loss related to the attacks.

263.     Corporal Trelain Whiting was awarded 100% disability from the Veterans Administration as a result of his injuries.

264.     The attacks that injured Corporal Whiting were facilitated by the material support and resources provided by Iran to militants in Iraq via Iranian-funded and -trained terror operatives in Iraq.

265.     As a result of the multiple attacks and the injuries he suffered, Corporal Whiting has experienced and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

## COUNT I
### (Injured)

266.     Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

267.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendant's provision of material support (within the meaning of §1605A(h)(3)) to terror operatives in Iraq who engaged in extrajudicial killing and who injured Plaintiffs.

268.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses.

269.    Plaintiffs' compensatory damages include, but not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses determined by the trier of fact.

270.    The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. §1605A(c).

**WHEREFORE**, Plaintiffs demand:

      (a)    Judgment for all Plaintiffs against Defendant for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium;

      (b)    Judgment for all Plaintiffs against Defendant for punitive damages;;

      (c)    Plaintiffs' costs and expenses;

      (d)    Plaintiffs' attorney's fees; and

      **(e)**    Such other and further relief as the Court finds just and equitable.

## COUNT II
### (Family Members/Solatium)

271.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

272.    Defendant's acts in providing material support for acts of extrajudicial attacks, torture, and hostage-taking were intended to inflict severe emotional distress on Plaintiffs.

273.    As a result of Defendant's acts, the families of individuals identified in the foregoing paragraphs as injured as a result of Defendant's acts in providing material support for acts of extrajudicial attacks, torture, and hostage-taking have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

274.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. §1605A(c).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

(a)    Judgment for all Plaintiffs against Defendant for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium'

(b)    Judgment for all Plaintiffs against Defendant for punitive damages;

(c)    Plaintiffs' costs and expenses;

(d)    Plaintiffs' attorney's fees; and

(e)    Such other and further relief as the Court finds just and equitable.

Dated: May 12, 2021

Respectfully Submitted,


 /s/Bradley M. Lakin
Bradley M. Lakin
DC Bar No. AZ0019
**SL CHAPMAN LLC**
10805 Sunset Hills Office Drive
Ste. 300
St. Louis, MO 63127
Telephone: (314) 655-7454
Fax: (314) 588-9302
Bradl@ChampionsForTheInjured.com


*Attorneys for Plaintiff*