## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CEDRIC M. BROWN et al., | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-01308 |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR DEFAULT JUDGMENT REGARDING LIABILITY

The Islamic Republic of Iran ("Defendant") has defaulted.  [Doc. 22].  Neither 28 U.S.C.

§ 1608(e) nor Rule 55(d) "relieves the sovereign from the duty to defend cases" or otherwise

"require[s] the court to demand more or different evidence than it would ordinarily receive …."

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *certified question answered,* 194

A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct.

1601 (2020).  Instead, "the quantum and quality of evidence that might satisfy a court can be less

than that normally required."  *Id*.  Consequently, plaintiffs may present evidence in the form of

affidavits and the court may accept plaintiffs' uncontroverted evidence as true.  *Bodoff v. Islamic

Republic of Iran,* 424 F.Supp.2d 74, 82 (D.D.C. Mar. 29, 2006); *Blais v. Islamic Republic of Iran*,

459 F. Supp. 2d 40, 53 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d

258, 268 (D.D.C. 2003).

## UNDISPUTED EVIDENCE AND JUDICIAL NOTICE

The FSIA "begins  with  a  presumption  of  immunity"  for  a  foreign  sovereign.  *Bell

Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Thus,

"[t]he plaintiff bears an initial burden of production to show an exception to immunity, such as §

1605A, applies." *Owens,* 864 F.3d at 784.  Once that burden is met, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply," *Bell Helicopter Textron,* 734 F.3d at 1183, by a preponderance of the evidence.  *Simon v. Republic of Hungary*, 812 F.3d 127, 147 (D.C. Cir. 2016).  "Therefore, if a plaintiff satisfies his burden of production and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches."  *Owens*, 864 F.3d at 784.

In FSIA cases, such as this one, involving defaulting defendants, the D.C. Circuit view the applicable evidentiary standards as follows:

As far as the defaulting sovereign is concerned, the FSIA requires only that a plaintiff "establish [] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This standard mimics a provision in Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. Government.  Neither § 1608(e) nor Rule 55(d) "relieves the sovereign from the duty to defend cases." *Id.*  Moreover, § 1608(e) does not "require the court to demand more or different evidence than it would ordinarily receive," [] indeed, "the quantum and quality of evidence that might satisfy a court can be less than that normally required."

*Owens*, 864 F.3d at 785 (internal citations omitted).  "This lenient standard is particularly appropriate for [an] FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Owens*, 864 F.3d at 785.  That is why "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Id.* at 785-786.

Moreover, "plaintiffs [may] prove their claims using evidence that might not be admissible in a trial." *Id.* at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044,

1048-51 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding)); *see also Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (a court may conduct an evidentiary hearing to evaluate a plaintiff's evidence, but FSIA § 1608(e) "does not actually demand a hearing or live testimony; it demands evidence."). Plaintiffs' evidence may be submitted without a hearing.  *Owens*, 864 F.3d at 788-789 ("As long as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it satisfactory, its form or type is irrelevant … [t]herefore the plaintiffs' 'failure' to present eyewitness testimony or other direct evidence is of no moment as to whether they have satisfied their burden of production."); *see also Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 280 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) ("[FSIA § 1608(e)] … does not actually demand a hearing or live testimony; it demands evidence.... Courts have accordingly recognized that FSIA plaintiffs seeking a default judgment can proceed by affidavit." (internal citations omitted)); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006) ("In evaluating plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.... Plaintiffs' evidence may take the form of sworn affidavits." (internal citations and quotation marks omitted)).

Furthermore, a court can and should take judicial notice of any fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Accordingly, this Court "may take judicial notice of related proceedings and records in cases before the same court." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009).  Indeed, "the FSIA does not require this Court to re-litigate issues that have already been settled" in previous decisions. *Id.* at 54.  "Instead, the Court may review evidence considered in an opinion

that is judicially noticed, without necessitating the re-presentment of such evidence." *Id.  See also, Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, at 60 (D.D.C. 2010); *See also, Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78 (D.D.C. 2002) and *Allan v. Islamic Republic of Iran,* No. 1:17-cv-00338 (RJL), 2019 WL 2185037 (D.D.C. May 21, 2019).  (In *Allan*, Judge granted nearly identical request to take judicial notice of evidentiary record in *Stethem supra*.)

These principles should guide this Court's review of Plaintiff's evidence which is more than sufficient to prove those elements of Plaintiffs' claims that FSIA §1605A requires to establish this Court's subject matter jurisdiction.

Plaintiffs also advise the Court that Judge John D. Bates in *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB held an extensive hearing on Iran's material support to the Taliban in Afghanistan in October of 2021.  Plaintiffs request that the Court take judicial notice of those findings pursuant to Federal Rule of Evidence 201(b).  Plaintiffs advise the Court of another recent decision in this District, holding Iran and the Islamic Revolutionary Guard Corps ("IRGC") liable for two terrorist attacks committed in 2015 and 2018 by the Taliban in Kabul, Afghanistan.  *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021).  *See also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019); *Karcher*, CV 16-232 (CKK), 2021 WL 133507 (D.D.C. Jan. 14, 2021); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019); *Lee v. Islamic Republic of Iran,* 518 F. Supp. 3d 475 (D.D.C. 2021)*; and Roberts v. Islamic Republic of Iran*, No. 1:20-CV-1227-RCL, 2022 WL 203540, at *13 (D.D.C. Jan. 24, 2022)*.*  Plaintiffs request that the Court take judicial notice of those findings pursuant to Federal Rule of Evidence 201(b).

# FACTS

## I.   BACKGROUND

### a.   <u>Iran's Role in the Region</u>

In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran." *Lee,* 518 F. Supp. 3d at 482.  Over the years, Iran built up combat forces composed of religious extremists and created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force").[1]  *Id*.  To preserve the ideals of the Islamic Republic, the Qods Force supports militias beyond its borders.  *Frost*, 383 F. Supp. 3d at 39.  Iran, of course, borders Iraq, Afghanistan, and Pakistan.  Among other responsibilities, the Qods Force is charged with "cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these militant groups to conduct terrorist attacks.  *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government."  *Lee*, 518 F. Supp. 3d at 482.  The Qods Force is responsible to and directed by the Supreme Leader of Iran.  *Frost*, 383 F. Supp. 3d at 39.

In the early 1980s, a loose network of Shia militias seeking to transform Lebanon into an Islamic republic formed Hezbollah.  *Fritz*, 320 F. Supp. 3d at 60.  Iran and the IRGC were "provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran."  *Lee*, 518 F. Supp. 3d at 483.  In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah."  *Lee*, 518 F. Supp. 3d at 483.  Hezbollah acts mainly at the direction of Iran.  *Frost*, 383 F. Supp. 3d at 39.  "Iran

---

[1]  The Qods Force is alternatively spelled Quds Force and/or referenced as IRGC-QF.

provides Hezbollah with as much as $700 million–$1 billion per year" in the form of cash, training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60. Hezbollah envisions itself as "the sharp end of the spear [,] going where Iran tells it to go in defense of ... Shia [Muslims] around the world." *Fritz*, 320 F. Supp. 3d at 60. Indeed, Hezbollah has committed numerous terrorist attacks on Americans at the behest of Iran. *Fritz*, 320 F. Supp. 3d at 60.

By the early 1990s, Hezbollah started to train al-Qaeda on its tactics and techniques, including IEDs, suicide bombings, and complex attacks and ambushes. *Ex. 20*. For example, in 1991, Ayman al Zawahiri, one of the top leaders of al-Qaeda, made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt. *Id*. While in Iran, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah. *Id*. Mughniyah was acting as an agent of the Iranian state, where he lived for many years as he coordinated high profile terrorist attacks around the globe. *Id*. During these meetings, Mughniyah convinced al-Qaeda of the power of suicide bombing. *Id*. This was a change in mindset for al-Qaeda because suicide was prohibited by most Islamic clerics, but Mughniyah justified it as an appropriate act of a jihad warrior. *Id*.

In 1993, Osama bin Laden and al Zawahiri met with Mughniyah and other Iranian officials, including IRGC General Mohammed Baqr Zolqadr, to work on details of a terrorism alliance. *Id*. Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. *Id*. At these camps, Hezbollah instructors provided al Qaeda operatives, as well as members of various other Islamic terrorist organizations, with training in intelligence, security, and building explosive devices. *Id*. This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities with Iranian government officials and the IRGC-QF. *Id*. The training focused on

building stronger IEDs and shape charges. *Id.* Iran's Supreme Leader was aware, and approved, of the Iran-Hezbollah terrorist training program. *Id.*

The Qods Force trained, equipped, and financed Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. *Frost*, 383 F. Supp. 3d at 39. According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, Hezbollah, and Iraqi Shia militant groups. *Fritz*, 320 F. Supp. 3d at 59. By using these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. *Id.* The State Department has designated Iran as a state sponsor of terrorism, and the Treasury Department has designated the IRGC's Qods Force as an entity providing support for terrorism. *Id.*

b. **Iraq**

In 2002, al Zarqawi and senior al-Qaeda operatives met with the Qods Force in Iran. *Ex. 20.* Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. *Lee*, 518 F. Supp. 3d at 483.

In March 2003, the Qods Force freed many of the Sunni jihadists that Iran had been holding captive, unleashing them against the U.S. *Ex. 20.* The Qods Force then provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and onto Baghdad to attack U.S. forces. *Id.* Al-Zarqawi recruited former Saddam regime fighters and foreign fighters moving into Iraq from Syria—becoming al-Qaeda's man on the ground. *Id.*

With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee*, 518 F. Supp. 3d at 483. Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and

therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control ... over the new Iraqi government." *Id.*

Iran also sought "to push the United States out of the Gulf region," including out of Iraq. *Fritz*, 320 F. Supp. 3d at 61. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Fritz*, 320 F. Supp. 3d at 61. But, while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained [] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." *Fritz*, 320 F. Supp. 3d at 61.

To achieve that goal, Iran developed numerous Shi'a proxies with a presence in Iraq. Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr. *Lee*, 518 F. Supp. 3d at 483. In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM"). *Id.* Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives ... to help establish JAM and provide it with logistical assistance." *Id.* Al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces. *Id.* For example, Al-Sadr formed Saraya al-Salam, which like previous Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq. *Frost*, 383 F. Supp. 3d at 40. Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad, and it exerted exclusive control over that area. *Id.* at 40.

While these Special Groups functioned independently from JAM, they were "funded, trained and armed by" IRGC "Qods Force operatives." *Fritz*, 320 F. Supp. 3d at 62. The Special Groups "plan[ned] and execut[ed] ... bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking [,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces. *Id.* The Special Groups were successful, and "the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq." *Lee*, 518 F. Supp. 3d at 483.

Iran then recruited new leadership for a Special Group called Asayb al-Haq or "AAH." *Id.* The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Fritz*, 320 F. Supp. 3d at 62. AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests." *Lee*, 518 F. Supp. 3d at 483. Qais Khazali also met with Qods Force officers "on multiple occasions" and his brother, Laith Khazali, effectively served as his deputy. *Fritz*, 320 F. Supp. 3d at 62.

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. *Karcher*, 396 F. Supp. 3d at 25. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," and earned the designation as a Foreign Terrorist Organization in June 2009. *Id.*

Iran also provided money and weapons to al Qa'ida in Iraq ("AQI"). *Ex. 20.* Iran even negotiated prisoner releases of AQI operatives. *Id.* In addition, Iran supported the Assad regime in Syria to maintain the "Shia Crescent" so it could move fighters and weapons to threaten Israeli and American interests. *Id.* Syrian intelligence officers not only facilitated al-Qaeda operations in Iraq, but the Syrian border became the principal conduit for foreign terrorists heading into Iraq to join AQI. *Id.*

Abu Musab al-Zarqawi, al-Qaeda's man in Iraq and the godfather of ISIS, received training and funds from the Qods Force in Iran before moving into Afghanistan and then heading al-Qaeda's terrorist operations in Iraq. *Id.* The Qods Force provided Zarqawi with funding, weapons, and transportation into Iraq to target U.S. troops. *Id.*

Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq. *Lee*, 518 F. Supp. 3d at 483. Iran also used its resources to support EFP attacks specifically: "one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." *Id.* Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." *Id.* Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*." *Id.*

Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training. *Karcher*, 396 F. Supp. 3d at 23. The Qods Force provided "Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed thousands of [c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs)... and are specially designed to defeat armored vehicles used by [c]oalition [f]orces." *Fritz*, 320 F. Supp. 3d at 63. Iran smuggled the weapons into Iraq using supply routes called "ratlines," primarily for use by AAH. *Id.* On the Iraqi side, both Qais and Laith Khazali were involved in smuggling arms and

artillery from Iran into Iraq. *Id.* Laith Khazali, for example, "was instrumental in acquiring surface-to-air missiles (SAMs), RPGs, bazookas and Stella missiles for [S]pecial [G]roups." *Id.*

At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others. *Fritz,* 320 F. Supp. 3d at 63. In 2005 or 2006, Hezbollah ordered Ali Musa Daqduq, a senior Hezbollah commander, to work with the Qods Force to "provide training and equipment" to the Special Groups, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah was organized in Lebanon." *Id.* Daqduq, accordingly, traveled to Iraq, "met with the commander and the deputy commander of the ... Qods Force special external operations," and "was directed by [the] Qods Force to make trips in and out of Iraq and [to] report on the training and operations of the Iraqi [S]pecial [G]roups." *Fritz,* at 63-64. Daqduq ultimately made four such trips to "monitor [ ] and report[ ] on the training and arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs], and kidnapping operations." *Fritz,* at 64.

With Hezbollah's assistance, Iran provided "training at every level of the militant organizations that received assistance, from foot soldier to leadership." *Fritz,* at 64. The leaders of Shia militias, for example, received "administrative, logistics, financial, religious [,] and small unit tactics leadership training." *Id.* AAH members were also given training in engineering, artillery, intelligence, infantry, and kidnapping. *Id.* Much of the training occurred at camps in Iran. *Id.* The Qods Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. *Id.* These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." *Id.* The Qods Force and Hezbollah also provided training inside Iraq. *Id.*

By 2007, the Treasury Department found that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher*, 396 F. Supp. 3d at 24.  In 2011, the State Department found that Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. *Id.*

    c.  **Afghanistan**

In addition to its activities in Iraq, Iran facilitated the movement of al-Qaeda operatives into Afghanistan and provided them with documents, identification cards, and passports. *Ex. 20*. Iran was a transit point for moving money, arms, and fighters to Pakistan and Afghanistan. *Id*.

According to the U.S. Department of the Treasury, the Qods Force has also supported militant groups including the Taliban. *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force is Iran's primary instrument for providing lethal aid to the Taliban. *Ex. 20*.  The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. *Id*.

Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban. *Ex. 20*.  The Taliban have conducted training in Iran as well. *Id*.  The Qods Force Ansar Corps, the IRGC command responsible for operations in Afghanistan, trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets. *Id*.  General Hossein Musavi was the commander of The Ansar Corps, which supported operations in Afghanistan. *Id*.   In addition to supplying weapons, Iran

has trained the Taliban in Iran on small unit tactics to include ambushes, mortar and rocket attacks, IEF, EFPs, sniper operations, and kidnapping operations.  *Id*.

## II.   ATTACKS AT ISSUE

### Attack #1 (June 24, 2004, Baqubah, Iraq)

Plaintiff Trelain Allen Whiting ("Whiting") is a national of the United States and served in the Army National Guard – North Carolina.  *Ex. 19*.  On June 24, 2004, Whiting and his unit were traveling in a convoy of Bradley Fighting Vehicles in Baqubah, Iraq.  *Id*.  As the convoy neared the Mufrek Traffic Circle, they were ambushed by machine gun rounds, RPGs, mortars, and a daisy chain of IEDs.  *Id*.  A firefight ensued, requiring additional U.S. forces.  *Id*.  Terrorist militia lead by Al-Zarqawi carried out this 24-hour long attack, which was coordinated with attacks in Fallujah and Al-Najaf.  *Ex. 20*.   Whiting sustained shrapnel wounds, gunshot wounds, burns, vision loss, traumatic brain injury, hearing loss, and PTSD.  *Ex. 19*.  Whiting has a 100% disability rating from the Veterans Administration.  *Id*. Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20*.  During this attack, a fellow soldier in his unit, Daniel Desens, Jr. ("Desens"), was killed. *Ex. 19 (See Exhibit D of Whiting's Declaration).*[2]

### Attack #2 (August 24, 2004, Husaybah, Al Anbar, Iraq)

Plaintiff Michael S. Nimtz ("Nimtz") is a national of the United States and served in the Marine Corps.  *Ex. 10*.  On August 24, 2004, Nimtz and his unit were in a convoy in, or around the Al Anbar Province, Iraq when their lead vehicle hit an IED, thereby exposing them to the blast from the IED detonation.  *Id*.  After the attack, Nimtz and his unit repelled the enemy, secured the

---

[2] *See* "Exhibit D" of Whiting's Declaration, which is a sworn statement by Ralph Isabella, fellow soldier to Whiting, states that Daniel Desens, Jr. died as a result of the August 24, 2004 attack. Desens' parents, Daniel Desens Sr. and Patricia Desens, are Plaintiffs in the Related Action, *Roth et al. v. Islamic Republic of Iran*, Case. No. 1:19-cv-02179.

area, and medevacked the injured Marines.  *Id.*  Nimtz sustained shrapnel wounds to his chin and

left arm, and was later diagnosed with a mood disorder, migraines, tinnitus, and planter fasciitis.

*Id.*  Nimtz has a 60% disability rating from the Veterans Administration. *Id.* Defendant's material

support or resources was a substantial factor leading to the attack.  *Ex. 20.*

### Attack #3 (November 15, 2006, Baghdad, Iraq)

Plaintiff Robert A. Chapman ("Chapman") is a national of the United States who was

employed as a Federal Civilian Employee of the U.S. Department of Justice as a Chief

Administrative Officer, Supervisory Contract Specialist and Senior Federal Law Enforcement

Officer (Special Deputy U.S. Marshall (SOG).  *Ex. 3.*  From approximately August of 2005 to

December 17, 2006, Chapman was assigned to the U.S. Embassy in Baghdad, Iraq and charged

with providing security, prisoner escort, and witness protection services. *Id.*  On November 15,

2006, Chapman was standing on the south side of the US Embassy taking a short break with a

co-worker when a mortar hit approximately 50 feet from where they were standing exposing

them to the blast and showering them with dirt and debris.  *Id.*  Chapman was diagnosed with

PTSD from a mortar attack on November 15, 2006, as well as being present at several high-

profile attacks, mortar attacks, and IDF in the Green Zone.  *Ex. 3, 20.*  Chapman has a 60%

disability rating from the Department of Justice. *Ex. 3.*  Defendant's material support or

resources was a substantial factor leading to the attack.  *Ex. 20.*

### Attack #4 (January of 2005 in Mahadami (Ramadi), Iraq).

Plaintiff Alfredo J. Casula Antunez ("Casula") is a national of the United States and served

in the Marine Corps.  *Ex. 2.*  In January of 2005, Casula was part of a convoy operating in, or

around Mahadami (Ramadi), Iraq when the convoy was hit with an IED explosion.  *Id.*  Casula

again sustained a traumatic brain injury, PTSD, tension headaches, knee conditions, and tinnitus

injuries.  *Id*.  Casula-Anpunez has a 100% disability rating from the Veterans Administration.  *Id.*
Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

### Attack #5 (May 12, 2005, Habbaniyah, Iraq)

Plaintiff Daniel Shepherd, Jr. ("Shepherd") is a national of the United States and served in
the Army.  *Ex. 15.*  On May 12, 2005, Shepherd and his unit were on a routine cordon and search
mission along MSR Michigan, approximately 14 miles west of Camp Habbaniyah when they came
upon a taxicab the driver and pregnant woman inside.  *Id.*  Shepherd's unit pulled security while
Shepherd assessed the pregnant woman.  *Id.*  As Shepherd was assessing the pregnant woman, a
Vehicle Borne IED (VBIED) was remote detonated killing the pregnant woman and taxi driver
and knocking Shepherd unconscious.  *Id.*  A Bradley arrived on the scene and transported Shepherd
back to Camp Habbaniyah for medical treatment.  *Id.*  Shepherd sustained a traumatic brain injury,
post-concussive syndrome with migraine headaches, tinnitus, IBS, a disc injury to his lumbar
spine, and PTSD.  *Id.* Shepard has a 100% disability rating from the Veterans' Administration.  *Id.*
Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

### Attack #6 (September of 2005, Fallujah, Iraq)

Plaintiff Eddie L. Ramos Santa ("Ramos") is a national of the United States and served in
the Army National Guard.  *Ex. 13.*  In September of 2005, Ramos and his unit were on a patrol in
a convoy of Humvees near Fallujah, Iraq when their convoy was suddenly attacked by terrorists
with RPGs and an IED.  *Id.*  The Humvee that Ramos was in took a direct hit which caused Ramos
to be slammed around the Humvee.  *Id.*  A translator who was also in the Humvee, was killed
during the attack and Ramos was tasked to pick-up his remains.  *Id.*  Ramos sustained tinnitus,
PTSD, lumbar strain, and right and left sided neuropathy.  *Id.*  Ramos received 90% Disability
from the Veterans' Administration.  *Id.*  Defendant's material support or resources was a

substantial factor leading to the attack.  *Ex. 20.*

**Attack #7 (March 6, 2006, in Fallujah, Iraq)**

Plaintiff Wayne C. Hermance ("Hermance") is a national of the United States and served in the Marine Corps.  *Ex. 7.*  On March 6, 2006, Hermance and his unit were part of a three-vehicle convoy that was traveling from an operation in a village in the outskirts of Fallujah, Iraq in an area called, "the Pocket."  *Id.*  Hermance was the driver of the third vehicle.  *Id.*  On the route was a bridge spanning a section of irrigation waterway that serviced local farms.  *Id.*  When the lead vehicle crossed, and the second vehicle entered the bridge, a terrorist placed IED was detonated at the rear of the second vehicle.  *Id.*  The explosion slightly lifted the rear of the second vehicle while shrapnel flattened both rear tires.  *Id.*  The third vehicle, which included Hermance, suffered*, inter alia,* a concussive blast from the IED, as well as shrapnel, debris, and dirt impacts.  *Id.*  Hermance sustained a traumatic brain injury, spinal cord injury at L5-S1, PTSD, headaches, left shoulder strain, cognitive disorder, left and right lower extremity radiculopathy, and tinnitus.  *Id.*  Hermance has a 100% disability rating from the Veterans' Administration.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

**Attack #8 (April of 2006, Mahmudiyah, Iraq)**

Plaintiff Danny Troy Perry, Jr. ("Perry") is a national of the United States and served in the Army.  *Ex. 11.*  In April of 2006, Perry and his unit departed FOB Mahmudiyah on a mission to install a clandestine cellular monitoring device.  *Id.*  Perry and his unit were traveling on "Route Sue" approximately less than 20 miles North, Northeast of FOB Mahmudiyah when the Humvee that Perry was in was hit by a controlled detonated IED.  *Id.*  The IED went off under the seat he was in, which, among other things caused him to be crushed by the door of the Humvee and by some ammo cans.  *Id.*  After the attack, Perry received treatment at FOB Mahmudiyah.  *Id.*  Perry

sustained a PTSD and tinnitus.  *Id.*  Perry has an 80% disability rating from the Veterans' Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

**Attack #9 (June 14, 2007, Al Shurtah, Iraq)**

Plaintiff Omar G. Vazquez Cordero ("Vazquez") is a national of the United States and served in the Army National Guard.  *Ex. 17.*  On June 14, 2007, Vazquez and his unit were performing a clearing mission on Route Aeros, around Baghdad, Iraq when the convoy stopped to interrogate a possible IED on the right side of the road in the Al Shurtah, 5th neighborhood of the Rasheed District.  *Id.*  As Vazquez and his unit were waiting on Explosive Ordinance Disposal to arrive on the scene, a terrorist fired RPG struck the vehicle Vazquez was in, exposing Vazquez to the blast and debris.  *Id.*  After the blast, Vazquez was transported to COP Guerrero for medical attention.  *Id.*  Vazquez sustained shrapnel wounds, tinnitus, and major post-traumatic depressive disorder with anxiety (PTSD).  *Id.*  Vazquez received a Bronze Star with Valor (V Device) for his actions during the attack.  *Id.*  Vazquez has an 80% disability rating from the Veterans' Administration.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

**Attack #10 (March 16, 2008, in Jamila, Sadr City, Iraq)**

Plaintiff Pierre L. Jones ("Jones") is a national of the United States and served in the Army. *Ex. 8.*  On March 16, 2008, Jones and his unit departed Camp Taji in striker vehicles for a patrol mission in a village of Sadr City, Iraq called Jamila.  *Id.*  When they arrived in Jamila, they dismounted for patrol and discovered a IED placed between two houses.  *Id.*  The IED was detonated exposing Jones and his unit to the blast and shrapnel from the IED explosion and knocking Jones to the ground.  *Id.*  After the IED blast, Jones was transported to Camp Liberty for

medical treatment. *Id.* Jones sustained PTSD, back injuries, hearing loss, tinnitus, and lung damage. *Id.* Jones has an 80% disability rating from the Veterans' Administration but is paid at the 100% rate because the VA deemed him unemployable due to his service-connected injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

### Attack #11 (October 24, 2008, Taji, Iraq)

Plaintiff David Ramirez ("Ramirez") is a national of the United States, served in the Army, and was employed by Kellogg, Brown, and Root, Inc. ("KBR") as a Logistics Coordinator. *Ex. 12.* From approximately May of 2008 to August 31, 2010, Ramirez was deployed to Iraq as a civilian Logistics Coordinator for KBR. *Id.* On October 24, 2008, Ramirez was on the flight line at Camp Taji in Iraq loading helicopters with materials and supplies when a terrorist fired mortar exploded approximately 12 feet from him, thereby exposing him to the blast and violently shaking his body. *Id.* Ramirez sustained a traumatic brain injury (TBI), PTSD, affective mood disorder, back injury (1 herniated, 3 bulging discs), whiplash in his neck, tendonitis in both shoulders, and hearing loss. *Id.* Ramirez was awarded disability from the Social Security Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

### Attack #12 (November of 2010, Kirkuk, Iraq)

Plaintiff Cedric M. Brown ("Brown") is a national of the United States and served in the Army. *Ex. 1.* Sometime in November of 2010, Brown was the gunman in a Stryker vehicle that was in a four-vehicle convoy on a clearing mission in, or around Kirkuk, Iraq when the Stryker vehicle he was in was hit by a terrorist placed IED. *Id.* The blast from the IED caused Brown to sustain shrapnel wounds to his face and back, and injuries to his shoulders and wrist as he was hanging out of the gunner's hatch of the Stryker. *Id.* Brown also sustained PTSD and a right knee

scars and strain from the attack. *Id.* Brown has a 60% disability rating from the Veterans' Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

**Attack #13 (February 22, 2004, Thaloqanin, Afghanistan)**

Plaintiff Suzanne Wheeler Wallace ("Wallace") is a national of the United States who was employed by The Louis Berger Group, Inc. ("LBG"). *Ex. 18.* Sometime in late October of 2003, Wallace was assigned by LBG to go to Afghanistan as a civilian Construction Superintend for a defense contractor to help build schools and health clinics in Afghanistan. *Id.* On February 22, 2004, Wallace was transported by a helicopter to the Village of Thaloqanin in the Kandahar Province in Afghanistan to do a construction related inspection on a clinic in that village. *Id.* On that same day and after the inspection, Wallace boarded the helicopter for a trip to the next inspection site when, as the helicopter was lifting off, the helicopter was attacked by terrorist fired small arms and an RPG. *Id.* During the attack, Wallace was struck three times in the torso, and once in her leg by small arms fire. *Id.* The pilot was killed, and another passenger was shot five times. *Id.* After the attack, Wallace was transported to Kandahar, Afghanistan, to an American Airforce base in Kabul, Afghanistan, Landstuhl Regional Medical Center in Germany, to a hospital in England, and then back to Texas for medical treatment. *Id.* Wallace sustained shrapnel wounds, gunshot wounds, scars to various parts of her body, severe and permanent injuries to her right leg and back, hearing loss, foot pain, and PTSD. *Id.* Wallace was awarded disability from the Social Security Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

**Attack #14 (April 5, 2005, Parwan Province, Afghanistan)**

Plaintiff Justin L. Shellhammer ("Shellhammer") is a national of the United States and served in the Army. *Ex. 14*. On April 5, 2005, the Bagram Air Base in Parwan Province, Afghanistan came under mortar attack. *Id.* After the attack, Shellhammer as Squad Leader of the Quick Reaction Force ("QRF"), was tasked with locating and taking care of the mortar threat. *Id.* When they got to the grid where the mortars were coming from, Shellhammer and the QRF squad dismounted their trucks and went down a dirt trail to locate the target. *Id.* Shellhammer was injured when he stepped on a landmine, which ended up blowing-up and causing Shellhammer to instantly lose his left leg below his knee. *Id.* Shellhammer also sustained PTSD, tinnitus, injuries to his lumbar back, right shoulder, right and left lower leg, right hip, and right and left knee. *Id.* Shellhammer received a Purple Heart for his injuries. *Id.* Shellhammer has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

**Attack #15 (March of 2006, East Paktika, Afghanistan)**

Plaintiff Terry De Andre Flood ("Flood") is a national of the United States and served in the Army. *Ex. 5*. In March of 2006, Flood was getting off a helicopter at FOB Shank in East Paktika, Afghanistan when a terrorist fired rocket landed five meters from where he was operating, thereby exposing him to the blast and causing him to fall to the ground. *Id.* Flood blacked out from the blast and was taken to FOB Shank to treat for his injuries. *Id.* Flood sustained a traumatic brain injury and PTSD. *Id.* Flood has a 100% disability rating from the Veterans' Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

**Attack #16 (October 10, 2010, Puli Alam, Afghanistan)**

Plaintiff Oren D. Gingrich ("Gingrich") is a national of the United States and served in the Army.  *Ex. 6.*  On October 10, 2010, Gingrich was walking across "Harball Utah" at FOB Shank in Puli Alam, Afghanistan for guard duty at CRSP yard, when a terrorist modified mortar round detonated knocking Gingrich to the ground causing near loss of consciousness.  *Id.*  Gingrich sustained a traumatic brain injury, seizures, disc disease, and PTSD.  *Id.*  Gingrich has a 100% disability rating from the Veterans' Administration and was also awarded disability from the Social Security Administration.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

**Attack #17 (October 29, 2010, Kandahar, Afghanistan)**

Plaintiff Lonnie J. Turney ("Turney") is a national of the United States and served in the Navy.  *Ex.16.*  On October 29, 2010, Turney was walking from chow on the Kandahar (also known as "Qandahar") Airforce base in Kandahar, Afghanistan when a terrorist fired rocket hit meters away from him.  *Id.*  Turney sustained a right lung injury, PTSD, injuries to his leg, and hearing loss.  *Id.*  Turney has an 80% disability rating from the Veterans' Administration.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 20.*

**Attack #18 (May 7, 2011, Paktika Province, Afghanistan)**

Plaintiff Roger A. Lobato Jr. ("Lobato") is a national of the United States and served in the Army.  *Ex. 9.*  On May 7, 2011, Lobato was traveling as a gunner in a lead scout truck coming from dropping off a host Afghan national at FOB Sharana in the Paktika Province, Afghanistan and heading toward Bagram Airfield, when a terrorist detonated a 700 to a 1,000-pound IED.  *Id.*  During the attack, Lobato was knocked unconscious for 2-5 minutes.  *Id.*  Lobato sustained a traumatic brain injury, an open head wound, PTSD, tinnitus, and a back injury.  *Id.*  Lobato

received a Purple Heart for his injuries from the attack. *Id.* Lobato has a 100% disability rating from the Veterans' Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

### Attack #19 (June 28, 2012, Kabul, Afghanistan)

Plaintiff Joshua W. Fisher ("Fisher") is a national of the United States and served in the Army. *Ex. 4.* On June 28, 2012, Fisher was the top gunner in the lead vehicle of a convoy that departed Bagram Air Base and headed south through Kabul, and toward FOB Shank in the Logar Province of Afghanistan. *Id.* Just as the convoy was outside the city limits of Kabul, the vehicle Fisher was in ran over a terrorist placed IED causing the vehicle to rollover and Fisher to lose consciousness. *Id.* After the attack, Fischer continued in and out of consciousness as he was transported to FOB Shank, Bagram Air Base, Landstuhl, Germany, and then to Walter Reed National Military Medical Center in Bethesda, MD where he was treated for his injuries. *Id.* Fischer sustained a traumatic brain injury, fractures to right knee and ankle, adjustment disorder with mixed anxiety (PTSD), and permanent scarring. *Ex. 4.* Fischer has an 80% disability rating from the Veterans' Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 20.*

## ARGUMENT

This Court may enter default judgment when (1) it has subject-matter jurisdiction over the claim, (2) personal jurisdiction is properly exercised over Iran, and (3) the plaintiffs have presented satisfactory evidence to establish their claims against Iran, and (4) the plaintiffs prove the monetary damages they seek. *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *4 (D.D.C. Mar. 31, 2022)

Here, Plaintiffs submit evidence regarding the first three steps for the requisite default

liability findings before proof of their damages.

## I.     THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS AGAINST IRAN

While foreign states are generally immunized from jurisdiction, 28 U.S.C. § 1604, this Court has original jurisdiction in "nonjury civil action" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity …." 28 U.S.C. § 1330(a).  According to the Foreign Sovereign Immunities Act ("FSIA"):

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

Plaintiffs seek money damages "for personal injury ... that was caused by" acts for which Iran, a foreign state, provided "material support or resources."  28 U.S.C. § 1605A(a)(1).  In the operative complaint, Plaintiffs allege that Defendant was designated as a state sponsor of terrorism, [Doc. 1, ¶2], who provided material support or resources to its agents, including Hezbollah, the Islamic Revolutionary Guard Corps, the Taliban, al Qaeda, and others.  [Doc. 1, ¶¶ 9, 10, 17-39]. *See also* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).  Armed with that material support and those resources, Defendant's agents then committed terrorist acts that caused personal injuries to Plaintiffs.  [Doc. 1, ¶¶ 17, 38, 67-265].  As a result, Plaintiffs seek damages for "their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses …."  [Doc. 1, ¶269].

Because Plaintiffs' claims for damages arise from personal injuries caused by acts for which Defendant provided material support, Defendant does not enjoy foreign sovereign immunity.

Plaintiffs' claims are also predicated on Defendant's "material support or resources" for an extrajudicial killing.  28 U.S.C. § 1605A(a)(l).  An "extrajudicial killing" is a killing, that is deliberated, and is not authorized by a previous judgment pronounced by a regularly constituted court or lawfully carried out under authority of a foreign nation.  28 U.S.C. § 1605A(h)(7); *Owens*, 864 F.3d at 770.  An extrajudicial killing includes "'deliberated' ***attempts*** to kill …." (emphasis added) *Karcher, 396 F. Supp. 3d at 58* (citing *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

An attempted extrajudicial killing can still constitute "act[s] of ... extrajudicial killing" under§ 1605A(a)(l).  *Roberts v. Islamic Republic of Iran*, No. 1:20-CV-1227-RCL, 2022 WL 203540 (D.D.C. Jan. 24, 2022).  § l605A(a)(l) reads as follows:

> A foreign state shall not be immune . . . in any case . . . in which money damages are sought against a foreign state for personal injury *or* death that was caused *by an act of* ... extrajudicial killing ... or the provision of material support or resources for such an act.

28 U.S.C. § 1605A(a)(l) (emphasis added).  *See also Cabrera v. Republic*, 2022 U.S. Dist. LEXIS 127290, at *134 (D.D.C. July 19, 2022) (Bates, J.) ("[E]ven where an attack killed no one—i.e., where it caused only physical injuries—the terrorism exception continues to apply.  Although '[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts' such as extrajudicial killing, courts in this District have concluded that injuries 'resulting from "deliberated" attempts to kill fall within the scope' of the terrorism exception.") (citation omitted); *Lee*, 518 F. Supp. 3d at 491.  ("Section 1605A(a)(1) and the court's mandate to construe

ambiguities in the FSIA broadly permits the court to exercise jurisdiction where a designated state supplies material resources in an attempt to commit an extrajudicial killing."); *Karcher*, 396 F. Supp. 3d at 58. (Kollar-Kotelly, J.) (given § 1605A's legislative history and the D.C. Circuit's instruction to interpret the statute broadly, "injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)" and "[d]eploying an EFP represents a 'deliberated' attempt to kill someone"); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 98 (D.D.C. 2017) (Walton, J.); *Pennington v. Islamic Republic of Iran*, 2021 U.S. Dist. LEXIS 117666, at *9 (D.D.C. June 24, 2021) (Boasburg, J.); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (Cooper, J.) As a result, liability attaches "where a designated state supplies material resources in an attempt to commit an extrajudicial killing." *Lee*, 518 F. Supp. 3d at 491.

Based upon the evidence submitted, the attacks at issue all involved extrajudicial killings. The evidence confirms that each attack was, at a minimum, an attempt to kill. Furthermore, a "'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 518 F. Supp. 3d at 492. The evidence confirms that each attack involved deliberate and strategic attempts to kill or alternatively take hostages. *Ex. 20, p. 22-24, 101.* In fact, one of the attacks (Attack 1) involved the death of at least one Soldier, and three other attacks (Attacks 5, 6, and 13) involved the death of other persons immediately next to the Solider or Plaintiff involved in the attack. *(See Ex. 13, 18, 19, 20).* The causalities involved in these attacks included a fellow Solider, a pregnant woman, a taxi driver, a translator, and a pilot). There is simply no evidence to suggest that any of these attacks were "on a sudden impulse;" rather, they were all part of a terror campaign to kill or alternatively take hostage. Finally, there is no evidence that the attempted killings were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation.

The FSIA next requires that an official or agent of Iran provided "material support or resources" to the people who carried out the attacks at issue. 28 U.S.C. § 1605A(a)(1). The FSIA adopted the following definition of "material support or resources":

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials[.]

28 U.S.C. § 1605A(h)(3) (adopting the definition of 18 U.S.C. § 2339A(b)(1)). Here, the evidence contains numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq and Afghanistan. The Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *Lee*, 518 F. Supp. 3d at 493.

Plaintiffs must also show that Defendant's material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794. But the provision of material support does not need to "go directly for the specific act." *Id.* at 799. Because material support "is difficult to trace" and "is fungible," courts do not require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id.*; *See also Boim v. Holy Land Foundation for Relief and Devel.*, 549 F.3d 685, 698 (7th Cir. 2008) (approving liability even when donations were made for non-terrorism purposes).

"[W]here a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the

[FSIA]." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 12 (D.D.C. 2010) (internal quotation marks and citation omitted); *Cohen,* 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *Murphy,* 740 F.Supp. 2d at 71; *see also*, *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011). Instead, there need only be evidence that Defendant's actions were a **"substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."** *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013) (emphasis added)).

Expert Pregent confirms that Defendant's material support or resources resulted in the attacks at issue. *Ex. 20.* Pregent undertook a detailed analysis of each attack, attributed each attack to a particular terrorist group(s), and submitted proof—in addition to the judicially-noticed factual findings—of how Defendant, through material support or resources, supported those particular terrorist group(s). *Id.* As a result, Defendant's material support or resources to support terrorist activities caused Plaintiffs' injuries.

When a plaintiff seeks monetary damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," this Court shall hear the claim if: (1) "the foreign country was designated a state sponsor of terrorism" at the time of the act, due to the act, or within 6 months before the claim was filed, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) the claimant or the victim was a national, member of the armed forces, or an employee or contractor of the United States at that time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III); and (3) the claimant afforded the foreign state a reasonable opportunity to arbitrate when "the act occurred in the foreign state …." 28 U.S.C. § 1605A(a)(2)(A)(iii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13-

14 (D.C. Cir. 2015).

### a. Defendant Was Designated a State Sponsor of Terrorism at the Time of the Terrorist Acts.

Since January 19, 1984, the United States has designated Defendant as a state sponsor of terrorism.  [Doc. 1 ¶2].  *See also Blais*, 459 F. Supp. 2d at 47.  In this case, the terrorist acts occurred from 2004 to 2012.  [Doc. 1 ¶¶67-265]; *Exs. 1-20*.  As a result, Defendant was a state sponsor of terrorism at the time of the acts.  28 U.S.C. § 1605A(a)(2)(A)(i)(I).

### b. Plaintiffs Were Nationals of the United States and Either (1) Members of the Armed Forces; (2) Employees of the Government of the United States, or (3) an Individual Performing a Contract Awarded by the United States Government, Acting Within the Scope of the Employee's Employment at the Time of the Terrorist Acts.

At the time of the terrorist attacks, all the Plaintiffs were nationals and were either members of the armed forces of the United States, employees of the government of the United States, or individuals performing a contract awarded by the United States government, acting within the scope of the employee's employment at the time of the attack.  *Exs. 1-19*.  In addition to their sworn testimony, Plaintiffs who were members of the armed forces have submitted their DD Form 214 to confirm their service at the time of the terrorist attacks.  *Id*.  As a result, all Plaintiffs meet the requirements under 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III).

### c. None of the Terrorist Acts Occurred Within Defendant's Boundaries.

The terrorist attacks at issue occurred in Iraq and Afghanistan.  [Doc. 1 ¶¶ 67-265]; *Exs. 1-19*.  None of the terrorist attacks occurred in Iran.  *Id*.  As a result, the requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action doesn't apply. 28 U.S.C. § 1605A(a)(2)(A)(iii).  As a result, this Court may properly exercise subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a).

## II.     THIS COURT HAS PERSONAL JURISDICTION OVER IRAN

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction ... where service has been made under section 1608 ...."  28 U.S.C. § 1330(b).   While section 1608 details four possible methods of serving a foreign state, Defendant has "neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017); [Doc. #s 20, 22].   Consequently, there were two remaining options to serve Defendant here.

First, a party shall serve a foreign state by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned ...."  28 U.S.C. § 1608(a)(3).  If service cannot be made within 30 days, then a party shall serve a foreign state by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a)(4).

Here, Plaintiffs sent the necessary papers to Defendant via "mail requiring a signed receipt."  [Doc. 10-11].  That complied with 28 U.S.C. § 1608(a)(3).  Next, Plaintiffs transmitted the necessary papers to Defendant via diplomatic channels that complied with 28 U.S.C. §1608(a)(4).  [Doc. 15-16].  Because service on Defendant was proper, personal jurisdiction exists here.

### III.   IRAN IS LIABLE UNDER FSIA  § 1605A(c) FOR ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant is responsible for the consequences of providing support and resources to the terrorists who conducted the attacks.  28 U.S.C. § 1605A(a)(1).  In addition, Defendant "shall be vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C. § 1605A(c).  Here, Plaintiffs submitted evidence that Defendant primarily acted through its Qods Force, its Ministry of Intelligence and Security ("MOIS"), and Lebanese Hezbollah to provide support and resources to the particular terrorists who injured Plaintiffs.  *Ex. 20 (and corresponding attachments.)*  "There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman*, 2019 WL 4673761, at *15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87; *Lee*, 518 F. Supp. 3d at 495.  As a result, there is more than satisfactory evidence to establish Defendant's liability.

#### a. Applicable Standard

"[T]he question whether a statute withdraws sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action" for which the defendant may be found liable. *Owens*, 864 F.3d at 807 (quoting *FDIC v. Meyer,* 510 U.S. 471, 484 (1994)).  Each of the Plaintiffs in this case sues Iran under the federal private right of action Congress provided to eligible individuals under FSIA § 1605A(c).  That section provides that a state sponsor of terrorism is liable, *inter alia*, "to a national of the United States," and all the Plaintiffs have proved they were U.S. citizens at the time of the attacks.

In addition, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding Iran liable for their injuries. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012). Courts define the theory of "personal injury" needed to prevail on a §1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery." *Oveissi, supra at 54;* see also *Fraenkel v. Islamic Repub. of Iran, et al.,* 892 F.3d 348, 353 (D.C. Cir. 2018).

As discussed, in this motion, Plaintiffs have presented overwhelming evidence that Iran provided material support for the attacks that caused Plaintiffs' harm. These terrorist acts include conduct that satisfies all the elements of the Plaintiffs' tort claims for assault, battery, and intentional infliction of emotional distress, according to the elements articulated by the Restatement (Second) of Torts. Am. Compl. ¶¶ 34-39. Family Member Plaintiffs bring claims for intentional infliction of emotional distress seeking solatium damages. All the Plaintiffs' evidentiary declarations, attached as *Exhibits 1-19* to this Motion, make out the elements of the applicable tort theories that correspond to their claims, based on the specific facts of their unique experiences.

### b. Plaintiffs Have Established Valid Theories of Recovery.

#### 1. The Plaintiffs Have Established Their Assault Claims.

"According to the Restatement (Second) of Torts, a defendant has committed an assault if 'he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact' and the person is 'thereby put in such imminent apprehension.'" *Sutherland*, 151 F. Supp. 2d at 48 (quoting Restatement (Second) of Torts § 21(1)

("Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'")); Restatement (Second) of Torts § 15.  On the other hand, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." *See Id.* § 19.

Here, Iran is liable for assaulting the Plaintiffs who, as established by their declarations, were physically harmed and terrified by the terrorists' actions.  The terrorists clearly intended to inflict that harm, and fear of harm, by using EFPs, Non-EFPs, as well as grenades and other explosive devices to target the soldiers, aiming weapons at the soldiers with the intent of killing and/or taking them hostage.  *See generally*, *Exs. 1-20.*  This is further evident from the fact that there were several casualties because of these attacks.  (*See* Attack 1, 5, 6, 13 above*, and Ex. 13, 18, 19, 20).*

Accordingly, Iran, as a provider of material support for these heinous acts, is liable for the pain and suffering caused by the assaults carried out by its terrorist agents in service of Iran's official foreign policy.  *See Valore*, 700 F. Supp. 2d at 76 ("It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: ***acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm.***  Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that defendants are liable for assault.") (emphasis added); *Sutherland*, 151 F. Supp. 2d at 48-9.

### 2. The Plaintiffs Have Established Their Battery Claims.

Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with … or an imminent apprehension of such a contact' by, those attacked and [ ] 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alteration in original) (quoting Restatement (Second) of Torts § 13); *see also* Restatement

(Second) of Torts § 18 (covering offensive contact that actually occurs). Again, "[h]armful contact is that which results in any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (internal quotation marks omitted). Moreover, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19.

Here, Plaintiffs were shot, thrown, and injured. *See generally Ex. 20.* The terrorists additionally destroyed soldiers' vehicles, barracks, and/or hiding places with both explosives and various weaponry. *Id.*: *see also Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342 (D.D.C. 2016) ("'Harmful contact' … can be caused by contacting either another's person directly or an instrumentality that acts as an extension of the individual's person, *such as a car or airplane in which the individual is traveling* ....") (emphasis added).   The terrorists killed persons directly next to or in contact with the Soldiers and Plaintiffs.  (*See* Attacks 1, 5, 6, 13).  Thus, Iran, as the provider of material support for these intentional acts of physical harm, is liable for the pain and suffering caused by these acts of battery.  *Sutherland*, 151 F. Supp. 2d at 48; *Valore*, 700 F. Supp. 2d at 77.

### 3. The Plaintiffs Have Established Their Emotional Distress Claims.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). "*All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience*: The more extreme and outrageous, the greater the resulting distress." *Stethem* at 89 (emphasis added); *see also* Restatement (Second) of Torts § 46, Comment (j) ("*Severe distress must be proved; but in*

*many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that distress has existed.*") (emphasis added).

Here, the Plaintiffs' declarations (*Exhibits 1-19*) describe their various feelings of tremendous terror, fear, helplessness, dread, and severe anxiety wreaked on them because of being threatened and attacked.  The Plaintiffs' declarations describe the emotional suffering they have endured as a result of witnessing persons being killed directly next to or in contact with them during these attacks.  (*See* Attacks 1, 5, 6, 13).  These deaths have included their colleagues, fellow soldiers, and innocent bystanders.  *Id.*  As described by each Plaintiff, each experienced severe distress while being deployed, attacked, and after returning home.  *Exs. 1-19.*  Thus, Iran, as the provider of material support to the terrorists, is liable for the pain and suffering caused by their acts of intentional infliction of emotional distress.  *Stethem* at 87; *see also Sutherland*, 151 F. Supp. 2d at 49-51 (Iran was liable for intentional infliction of emotional distress suffered by plaintiff because it funded and controlled Hezbollah.).

The Family Member Plaintiffs also have established their emotional distress claims. "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005)*; see also Stethem* at 89; *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (the "'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'être*").

Accordingly, even where a family member was not physically present during a terrorist attack, they may recover for claims of intentional infliction of emotional distress in FSIA terrorism cases. *Heiser*, 659 F. Supp. 2d at 27; *Valore*, 700 F. Supp. 2d at 80 ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries

suffered as a result."); *Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family.").  Only immediate family members including one's spouse, parents, siblings, and children (or in rare cases other individuals residing in the victim's household who in other important respects were like a spouse, parent, sibling, or child to the victim) may recover.  *Heiser*, 659 F. Supp. 2d at 28-29.  Here, the Family Member Plaintiffs' declarations establish that they all qualify as immediate family members.

Those declarations also establish that all the Family Member Plaintiffs suffered from severe emotional distress because of the terrorists' intentional and reckless acts of terrorism.  All Family Member Plaintiffs were forced to live nationally televised terrorists' activity in Iraq and Afghanistan, all the while fearing for their loved ones' lives.  Some Family Member Plaintiffs had to endure this horror during the entire time that their loved ones were in unknown locations in Iraq and Afghanistan, while the injured Plaintiffs received medical treatment abroad far from their homes.  *Exs. 1-19*.  These events resulted in severe emotional distress for all the Family Member Plaintiffs that unquestionably rises to an actionable level under the Restatement.  *Stethem*, at 92; *Sutherland*, 151 F. Supp. 2d at 43, 50-52 (acknowledging family members' anguished feelings, both during and after their loved one's release, and holding Iran liable for damages suffered for intentional infliction of emotional distress).

## CONCLUSION

WHEREFORE, Plaintiffs request that this Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs on how to proceed regarding the presentation of evidence as to monetary damages.

DATED: September 1, 2022.


Respectfully submitted,


By: /s/ Bradley M. Lakin
   Bradley M. Lakin DC Bar No. AZ0019
   bradl@slchapman.com
   SL CHAPMAN, LLC
   10805 Sunset Office Drive, Suite 300
   St. Louis, MO 63127
   314.588.9300
   314.588.9302 fax