# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|   |   |
|---|---|
| CEDRIC M. BROWN et al., | |
| Plaintiffs, | Case No. 1:21-cv-01308 |
| v. | |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OPINION AND ORDER

This case involves claims under the Foreign Sovereign Immunities Act ("FSIA") against Iran for materially supporting terrorist activities leading to multiple different attacks in Iraq and Afghanistan that resulted in permanent injuries to nineteen individuals.  Iran has failed to respond to the complaint, the clerk has entered a default, and Plaintiffs have moved for default judgment.

A request for default judgment under the FSIA is governed by the statutory requirement that "[n]o judgment by default shall be entered ... against a foreign state ... unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

## FINDINGS OF FACT

This case, unfortunately, is not the first involving Iran's activities in supporting terrorism. Indeed, several courts have made multiple findings of fact regarding Iran's material support or resources provided to foment terrorist activities in Iraq, Afghanistan and the Middle East.  *See Roth v. Islamic Republic of Iran,* 1:19-CV-02179-TNM, 2023 WL 196577 (D.D.C. Jan. 17, 2023); *Pennington v. Islamic Republic of Iran*, No. CV 19-796 (JEB), 2022 WL 168261 (D.D.C. Jan. 19, 2022); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019); *Karcher*, CV 16-232 (CKK), 2021 WL 133507, at *1 (D.D.C. Jan. 14, 2021); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021); *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021);

and *Roberts v. Islamic Republic of Iran*, No. 1:20-CV-1227-RCL, 2022 WL 203540, at *13 (D.D.C. Jan. 24, 2022), *Estate of Christopher Brook Fischbeck et al., v. The Islamic Republic of Iran, et al.,* Case No. 18-cv-2248 (CRC); and the related case *Roth v. Islamic Republic of Iran,* 1:19-CV-02179-TNM, 2023 WL 196577 (D.D.C. Jan. 17, 2023). Pursuant to Federal Rule of Evidence 201(b), the court takes judicial notice of the relevant findings of fact in those prior decisions as set forth herein.

While relying upon the findings in the prior decisions, the court has also independently reviewed the evidence submitted by Plaintiffs, including exhibits along with the declarations of Plaintiffs and expert Michael P. Pregent ("Pregent"), to reach its findings of fact here. The court finds that Pregent meets the requirements of Rule 702 for an expert witness. In fact, Pregent has provided expert testimony in the *Roth, Pennington, Frost*, *Karcher*, *W.A*., and *Lee* cases—the very cases from which the court has taken judicial notice of numerous findings of fact.

## Iran's Role in the Region

In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran." *Lee,* 518 F. Supp. 3d at 482. Over the years, Iran built up combat forces composed of religious extremists and created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force").[1] *Id*. To preserve the ideals of the Islamic Republic, the Qods Force supports militias beyond its borders. *Frost*, 383 F. Supp. 3d at 39. Iran, of course, borders Iraq, Afghanistan, and Pakistan. Among other responsibilities, the Qods Force is charged with "cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these militant groups to conduct terrorist attacks. *Fritz*, 320 F. Supp. 3d at 59. The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government." *Lee,* 518 F. Supp. 3d at 482. The Qods Force is responsible to and directed by the Supreme Leader of Iran. *Frost*, 383 F. Supp. 3d at 39.

In the early 1980s, a loose network of Shia militas seeking to transform Lebanon into an Islamic republic formed Hezbollah. *Fritz*, 320 F. Supp. 3d at 60. Iran and the IRGC were "provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran." *Lee,* 518 F. Supp. 3d at 483. In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Id*. Hezbollah acts mainly at the direction of Iran. *Frost*, 383 F. Supp. 3d at 39. "Iran provides Hezbollah with as much as $700 million–$1 billion per year" in the form of cash, training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60. Hezbollah envisions itself as "the sharp end of the spear [,] going where Iran tells it to go in defense of ... Shia [Muslims] around the world." *Fritz*, 320 F. Supp. 3d at 60. Indeed, Hezbollah has committed numerous terrorist attacks on Americans at the behest of Iran. *Fritz*, 320 F. Supp. 3d at 60.

By the early 1990s, Hezbollah started to train al-Qaeda on its tactics and techniques, including IEDs, suicide bombings, and complex attacks and ambushes. *Ex. 20a*. For example, in

---

[1] The Qods Force is alternatively spelled Quds Force and sometimes referred to as IRGC-QF.

1991, Ayman al Zawahiri, one of the top leaders of al-Qaeda, made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt. *Id.* While in Iran, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah. *Id.* Mughniyah was acting as an agent of the Iranian state, where he lived for many years as he coordinated high profile terrorist attacks around the globe. *Id.* During these meetings, Mughniyah convinced al-Qaeda of the power of suicide bombing. *Id.* This was a change in mindset for al-Qaeda because suicide was prohibited by most Islamic clerics, but Mughniyah justified it as an appropriate act of a jihad warrior. *Id.*

In 1993, Osama bin Laden and al Zawahiri met with Mughniyah and other Iranian officials, including IRGC General Mohammed Baqr Zolqadr, in Khartoum, Sudan to work on details of a terrorism alliance. *Ex. 20a.* Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. *Id.* At these camps, Hezbollah instructors provided al-Qaeda operatives, as well as members of various other Islamic terrorist organizations, with training in intelligence, security, and building explosive devices. *Id.* This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities with Iranian government officials and the IRGC-QF. *Id.* The training focused on building stronger IEDs and shape charges. *Id.* Iran's Supreme Leader was aware, and approved, of the Iran-Hezbollah terrorist training program. *Id.*

The Qods Force trained, equipped, and financed Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. *Frost*, 383 F. Supp. 3d at 39. According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, Hezbollah, and Iraqi Shia militant groups. *Fritz*, 320 F. Supp. 3d at 59. By using these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. *Fritz*, 320 F. Supp. 3d at 59. The State Department has designated Iran as a state sponsor of terrorism, and the Treasury Department has designated the Qods Force as an entity providing support for terrorism. *Fritz*, 320 F. Supp. 3d at 59.

## **Iraq**

Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. *Lee,* 518 F. Supp. 3d at 483. For example, in 2002, Abu Musab al-Zarqawi and senior al-Qaeda operatives met with the Qods Force in Iran. *Ex. 20a.*

In March 2003, the Qods Force freed many of the Sunni jihadists that Iran had been holding captive, unleashing them against the U.S. *Id.* The Qods Force then provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and then onto Baghdad to attack U.S. forces. *Ex. 20a.* Al-Zarqawi recruited former Saddam regime fighters and foreign fighters moving into Iraq from Syria—becoming al-Qaeda's man on the ground. *Id.*

With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee*, 518 F. Supp. 3d at 483.

Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control ... over the new Iraqi government." *Id.*

Iran also sought "to push the United States out of the Gulf region," including out of Iraq. *Fritz*, 320 F. Supp. 3d at 61. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Fritz*, 320 F. Supp. 3d at 61. But, while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained[ ] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." *Fritz*, 320 F. Supp. 3d at 61.

To achieve that goal, Iran developed numerous Shi'a proxies with a presence in Iraq. Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr. *Lee*, 518 F. Supp. 3d at 483. In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM"). *Id.* Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives ... to help establish JAM and provide it with logistical assistance." *Id.* Al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces. *Id.* For example, Al-Sadr formed Saraya al-Salam, which like previous Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq. *Frost*, 383 F. Supp. 3d at 40. Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad, and it exerted exclusive control over that area. *Id.*

While these Special Groups functioned independently from JAM, they were "funded, trained and armed by" the "Qods Force operatives." *Fritz*, 320 F. Supp. 3d at 62. The Special Groups "plan[ned] and execut[ed] ... bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking[,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces. *Fritz*, 320 F. Supp. 3d at 62. The Special Groups were successful, and "the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq." *Lee*, 518 F. Supp. 3d at 483.

Iran then recruited new leadership for a Special Group called Asayb al-Haq or "AAH." *Lee*, 518 F. Supp. 3d at 483. The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Fritz*, 320 F. Supp. 3d at 62. AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests." *Lee*, 2021 WL 325958, at *4. Qais Khazali also met with Qods Force officers "on multiple occasions" and his brother, Laith Khazali, effectively served as his deputy. *Fritz*, 320 F. Supp. 3d at 62.

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. *Karcher*, 396 F. Supp. 3d at 25. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq,"

and earned the designation as a Foreign Terrorist Organization in June 2009. *Karcher*, 396 F. Supp. 3d at 25.

Iran also provided money and weapons to al Qa'ida in Iraq ("AQI"). *Ex. 20a.* Iran even negotiated prisoner releases of AQI operatives. *Id*. In addition, Iran supported the Assad regime in Syria to maintain the "Shia Crescent" so it could move fighters and weapons to threaten Israeli and American interests. *Ex. 20a.* Syrian intelligence officers not only facilitated al-Qaeda operations in Iraq, but the Syrian border became the principal conduit for foreign terrorists heading into Iraq to join AQI. *Ex. 20a.*

Al-Zarqawi, al-Qaeda's man in Iraq and the godfather of ISIS, received training and funds from the Qods Force in Iran before moving into Afghanistan and then heading al-Qaeda's terrorist operations in Iraq. *Ex. 20a.* The Qods Force provided Zarqawi with funding, weapons, and transportation into Iraq to target U.S. troops. *Ex. 20a.*

Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq. *Lee*, 518 F. Supp. 3d at 483. Iran also used its resources to support EFP attacks specifically: "one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." *Id.* Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." *Id*. Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*." *Id.*

Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training. *Karcher*, 396 F. Supp. 3d at 23. The Qods Force provided "Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed thousands of [c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs)... and are specially designed to defeat armored vehicles used by [c]oalition [f]orces." *Fritz*, 320 F. Supp. 3d at 63. Iran smuggled the weapons into Iraq using supply routes called "ratlines," primarily for use by AAH. *Fritz*, 320 F. Supp. 3d at 63. On the Iraqi side, both Qais and Laith Khazali were involved in smuggling arms and artillery from Iran into Iraq. *Fritz*, 320 F. Supp. 3d at 63. Laith Khazali, for example, "was instrumental in acquiring surface-to-air missiles (SAMs), RPGs, bazookas and Stella missiles for [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at 63.

At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others. *Fritz*, 320 F. Supp. 3d at 63. In 2005-06, Hezbollah ordered Ali Musa Daqduq, a senior Hezbollah commander, to work with the Qods Force to "provide training and equipment" to the Special Groups, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah was organized in Lebanon." *Fritz*, 320 F. Supp. 3d at 63. Daqduq traveled to Iraq, "met with the commander and the deputy commander of the ... Qods Force special external operations," and "was directed by [the] Qods Force to make trips in and out of Iraq and [to] report on the training

and operations of the Iraqi [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at 63-64.   Daqduq ultimately made four such trips to "monitor[ ] and report[ ] on the training and arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs], and kidnapping operations." *Fritz*, 320 F. Supp. 3d at 64.

With Hezbollah's assistance, Iran provided "training at every level of the militant organizations that received assistance, from foot soldier to leadership." *Fritz*, 320 F. Supp. 3d at 64. The leaders of Shia militias, for example, received "administrative, logistics, financial, religious [,] and small unit tactics leadership training." *Fritz*, 320 F. Supp. 3d at 64.  AAH members were also given training in engineering, artillery, intelligence, infantry, and kidnapping. *Fritz*, 320 F. Supp. 3d at 64.  Much of the training occurred at camps in Iran. *Fritz*, 320 F. Supp. 3d at 64. The Qods Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. *Fritz*, 320 F. Supp. 3d at 64.  These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." *Fritz*, 320 F. Supp. 3d at 64.  The Qods Force and Hezbollah also provided training inside Iraq. *Fritz*, 320 F. Supp. 3d at 64.

By 2007, the Treasury Department found that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher*, 396 F. Supp. 3d at 24.  In 2011, the State Department found that Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. *Karcher*, 396 F. Supp. 3d at 24.

### Afghanistan

In addition to its activities in Iraq, Iran facilitated the movement of al-Qaeda operatives into Afghanistan and provided them with documents, identification cards, and passports. *Ex. 20a*. Iran was a transit point for moving money, arms, and fighters to Pakistan and Afghanistan. *Id*.

According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban. *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force is Iran's primary instrument for providing lethal aid to the Taliban. *Ex. 20a*.  The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. *Id*.

Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban. *Ex. 20a*.  The Taliban have conducted training in Iran too. *Id*.  The Qods Force Ansar Corps, the IRGC command responsible for operations in Afghanistan, trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets. *Id*.  General Hossein Musavi was the commander of The Ansar Corps, which supported operations in Afghanistan. *Id*.  In addition to supplying weapons, Iran has trained the Taliban in Iran on small unit tactics to include ambushes, mortar and rocket attacks, IEF, EFPs, sniper operations, and kidnapping operations. *Id*.

**The Attacks**

**Attack #1 (June 24, 2004, Baqubah, Iraq) –** Plaintiff Trelain Allen Whiting ("Whiting") is a national of the United States and served in the Army National Guard – North Carolina. *Ex. 19.* On June 24, 2004, Whiting and his unit were traveling in a convoy of Bradley Fighting Vehicles in Baqubah, Iraq. *Id.* As the convoy neared the Mufrek Traffic Circle, they were ambushed by machine gun rounds, RPGs, mortars, and a daisy chain of IEDs. *Id.* A firefight ensued, requiring additional U.S. forces. *Id.* Whiting sustained shrapnel wounds, gunshot wounds, burns, vision loss, traumatic brain injury, hearing loss, and PTSD. *Ex. 19.* During this attack, a fellow soldier in his unit, Daniel Desens, Jr. ("Desens"), was killed. *Ex. 19 (See Exhibit D of Whiting's Declaration).* [2]

In the related case, *Roth v. Islamic Republic of Iran*, 1:19-CV-02179-TNM, 2023 WL 196577 (D.D.C. Jan. 17, 2023), this Court already found that Iran was liable for Attack #1, which is the same attack that is also labeled "Attack #1" in the present matter. **See** Exhibit 73; *Roth*, 2023 WL 196577, at *6-7, 17 (D.D.C. Jan. 17, 2023). Whiting, Plaintiff in this matter, was injured in this attack along with 14 other Soldiers who were plaintiffs in the *Roth* matter. Therefore, Defendant's material support was a substantial factor leading to Attack #1.

**Attack #2 (August 24, 2004, Husaybah, Al Anbar, Iraq).** Plaintiff Michael S. Nimtz ("Nimtz") is a national of the United States and served in the Marine Corps. *Ex. 10.* On August 24, 2004, Nimtz and his unit were in a convoy in, or around the Al Anbar Province, Iraq when their lead vehicle hit an IED, thereby exposing them to the blast from the IED detonation. *Id.* After the attack, Nimtz and his unit repelled the enemy, secured the area, and medevacked the injured Marines. *Id.* Nimtz sustained a mood disorder, migraines, tinnitus, and planter fasciitis. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #2. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #2. *Id.*

**Attack #3 (November 15, 2006, Baghdad, Iraq).** Plaintiff Robert A. Chapman ("Chapman") is a national of the United States who was employed as a Federal Civilian Employee of the U.S. Department of Justice as a Chief Administrative Officer, Supervisory Contract Specialist and Senior Federal Law Enforcement Officer (Special Deputy U.S. Marshall (SOG). *Ex. 3a.* From approximately August of 2005 to December 17, 2006, Chapman was assigned to the U.S. Embassy in Baghdad, Iraq and charged with providing security, prisoner escort, and witness protection services. *Id.* On November 18, 2005, Chapman responded to an attack involving tow suicide bombers who detonated cars laden with Vehicle Borne IEDs (VBIED) near the al Hamra hotel and interior ministry complex in the Al Jadriyah district, in central Baghdad. *Id.* On that day, Chapman utilized his skills as an EMT to assist victims of the blast and was exposed to the death,

---

[2] Desens' parents, Daniel Desens Sr. and Patricia Desens, are Plaintiffs in the Related Action, *Roth et al. v. Islamic Republic of Iran*, Case. No. 1:19-cv-02179, 2023 WL 196577 (D.D.C. Jan. 17, 2023).

destruction, and pain and suffering of the victims of the blast. *Id.* Chapman sustained PTSD. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #5. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #3. *Id.*

**Attack #4 (January of 2005 in Mahadami (Ramadi), Iraq).** Plaintiff Alfredo J. Casula Antunez ("Casula") is a national of the United States and served in the Marine Corps. *Ex. 2.* Sometime in January of 2005, Casula was part of a convoy operating in, or around Mahadami (Ramadi), Iraq when the convoy was hit with an IED explosion. *Id.* Casula again sustained a traumatic brain injury, PTSD, tension headaches, knee conditions, IBS, and tinnitus injuries. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #4. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #4. *Id.*

**Attack #5 (May 12, 2005, Habbaniyah, Iraq).** Plaintiff Daniel Shepherd Jr. ("Shepherd") is a national of the United States and served in the Army. *Ex. 15.* On May 12, 2005, Shepherd and his unit were on a routine cordon and search mission along MSR Michigan, approximately 14 miles west of Camp Habbaniyah when they came upon a taxicab the driver and pregnant woman inside. *Id.* Shepherd's unit pulled security while Shepherd assessed the pregnant woman. *Id.* As Shepherd was assessing the pregnant woman, a Vehicle Borne IED was remote detonated killing the pregnant woman and taxi driver and knocking Shepherd unconscious. *Id.* A Bradley arrived on the scene and transported Shepherd back to Camp Habbaniyah for medical treatment. *Id.* Shepherd sustained post-concussive syndrome with migrane headaches, a traumatic brain injury, tinnitus, IBS, a disc injury, and PTSD. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #5. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #5. *Id.*

**Attack #6 (September of 2005, Fallujah, Iraq).** Plaintiff Eddie L. Ramos Santa ("Ramos") is a national of the United States and served in the Army National Guard. *Ex. 13.* In September of 2005, Ramos and his unit were on a patrol in a convoy of Humvees near Fallujah, Iraq when their convoy was suddenly attacked by terrorists with RPGs and a road-side bomb. *Id.* The Humvee that Ramos was in took a direct hit which caused Ramos to be slammed around the Humvee. *Id.* A translator who was also in the Humvee, was killed during the attack and Ramos was tasked to pick-up his remains. *Id.* Ramos sustained tinnitus, PTSD, lumbar strain, and right and left sided neuropathy. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah lethal aid and material support performed Attack #6. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah was a substantial factor leading to Attack #6. *Id.*

**Attack #7 (March 6, 2006, in Fallujah, Iraq).** Plaintiff Wayne C. Hermance ("Hermance") is a national of the United States and served in the Marine Corps. *Ex. 7.* On March 6, 2006, Hermance and his unit were part of a three-vehicle convoy that was traveling from an operation in a village in the outskirts of Fallujah, Iraq in an area called, "the Pocket." *Id.* Hermance was the driver of the third vehicle. *Id.* On the route was a bridge spanning a section of irrigation waterway that serviced local farms. *Id.* When the lead vehicle crossed, and the second vehicle entered the bridge, a terrorist placed IED was detonated at the rear of the second vehicle. *Id.* The explosion slightly lifted the rear of the second vehicle while shrapnel flattened both rear tires. *Id.* The third vehicle, which included Hermance, suffered a concussive blast from IED, as well as shrapnel, debris, and dirt impacts. *Id.* Hermance sustained a traumatic brain injury, spinal cord injury at L5-S1, PTSD, headaches, left shoulder strain, cognitive disorder, left and right lower extremity radiculopathy, and tinnitus. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #7. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #7. *Id.*

**Attack #8 (April of 2006, Mahmudiyah, Iraq).** Plaintiff Danny Troy Perry Jr. ("Perry") is a national of the United States and served in the Army. *Ex. 11.* In April of 2006, Perry and his unit departed FOB Mahmudiyah on a mission to install a clandestine cellular monitoring device. *Id.* Perry and his unit were traveling on "Route Sue" approximately less than 20 miles North, Northeast of FOB Mahmudiyah when the Humvee that Perry was in was hit by a controlled detonated IED. *Id.* The IED went off under the seat he was in, which, among other things caused him to be crushed by the door of the Humvee and by some ammo cans. *Id.* After the attack, Perry received treatment at FOB Mahmudiyah. *Id.* Perry sustained PTSD and tinnitus. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #8. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #8. *Id.*

**Attack #9 (June 14, 2007, Al Shurtah, Iraq).** Plaintiff Omar G. Vazquez Cordero ("Vazquez") is a national of the United States and served in the Army National Guard. *Ex. 17.* On June 14, 2007, Vazquez and his unit were performing a clearing mission on Route Aeros, around Baghdad, Iraq when the convoy stopped to interrogate a possible IED on the right side of the road in the Al Shurtah, 5th neighborhood of the Rasheed District. *Id.* As Vazquez and his unit were waiting on EOD to arrive on the scene, a terrorist fired RPG struck the vehicle Vazquez was

in, exposing Vazquez to the blast and debris. *Id.* After the blast, Vazquez was transported to COP Guerrero for medical attention. *Id.* Vazquez sustained shrapnel wounds, tinnitus, major post-traumatic depressive disorder with anxiety (PTSD), and a rash. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #9. *Ex. 20a*. Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #9. *Id.*

**Attack #10 (March 16, 2008 in Jamila, Sadr City, Iraq).** Plaintiff Pierre L. Jones ("Jones") is a national of the United States and served in the Army. *Ex. 8*. On March 16, 2008, Jones and his unit departed Camp Taji in striker vehicles for a patrol mission in a village of Sadr City, Iraq called Jamila. *Id.* When they arrived in Jamila, they dismounted for patrol and discovered a IED placed between two houses. *Id.* The IED was detonated exposing Jones and his unit to the blast and shrapnel from the IED explosion and knocking Jones to the ground. *Id.* After the IED blast, Jones was transported to Camp Liberty for medical treatment. *Id.* Jones sustained PTSD, back injuries, hearing loss, tinnitus, and lung damage. *Id.*

Based upon the evidence, the IRGC-QF created, trained, funded, and directed Iraqi Shia Special Groups (SG) who performed Attack #10. *Ex. 20a*. Iran's material support for and resources to IRGC-QF who created, trained, funded and directed SG, was a substantial factor leading to Attack #10. *Id*.

**Attack #11 (October 24, 2008, Taji, Iraq).** Plaintiff David Ramirez ("Ramirez") is a national of the United States, served in the Army, and was employed by Kellogg, Brown, and Root, Inc. ("KBR") as a Logistics Coordinator. *Ex. 12*. From approximately May of 2008 to August 31, 2010, Ramirez was deployed to Iraq as a civilian Logistics Coordinator for KBR. *Id.* On October 24, 2008, Ramirez was on the flight line at Camp Taji in Iraq loading helicopters with materials and supplies when another terrorist fired mortar exploded approximately 12 feet from him, thereby again exposing him to the blast and violently shaking his body. *Ex. 12*. Ramirez sustained a traumatic brain injury, PTSD, affective mood disorder, back injury (1 herniated, 3 bulging discs), whiplash in his neck, tendonitis in both shoulders, and hearing loss. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #11. *Ex. 20a*. Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #11. *Id*.

**Attack #12 (November of 2010, Kirkuk, Iraq).** Plaintiff Cedric M. Brown ("Brown") is a national of the United States and served in the Army. *Ex. 1*. In November of 2010, Brown was the gunman in a Stryker vehicle that was in a four-vehicle convoy on a clearing mission in, or around Kirkuk, Iraq when the Stryker vehicle he was in was hit by a terrorist placed IED. *Id.* The blast from the IED caused Brown to sustain shrapnel wounds to his face, and injuries to his back,

shoulders and wrist as he was hanging out of the gunner's hatch of the Stryker. *Id.* Brown also sustained PTSD and a knee condition from the attack. *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #12. *Ex. 20a.* Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #12. *Id.*

**Attack #13 (February 22, 2004, Thaloqanin, Afghanistan).** Plaintiff Suzanne Wheeler Wallace ("Wallace") is a national of the United States who was employed by The Louis Berger Group, Inc. ("LBG"). *Ex. 18a.* In late October of 2003, Wallace was assigned by LBG to go to Afghanistan as a civilian Construction Superintend for a defense contractor to build schools and health clinics in Afghanistan. *Id.* On February 22, 2004, Wallace was transported by a helicopter to the Village of Thaloqanin in the Kandahar Province in Afghanistan to do a construction related inspection on a clinic in that village. *Id.* On that same day and after the inspection, Wallace boarded the helicopter for a trip to the next inspection site when, as the helicopter was lifting off, the helicopter was attacked by terrorist fired small arms and an RPG. *Id.* During the attack, Wallace was struck three times in the torso, and once in her leg by small arms fire. *Id.* The pilot was killed, and another passenger was shot five times. *Id.* After the attack, Wallace was transported to Kandahar, Afghanistan, to an American Airforce base in Kabul, Afghanistan, Landstuhl Regional Medical Center in Germany, to a hospital in England, and then back to Texas for medical treatment. *Id.* Wallace sustained shrapnel wounds, gunshot wounds, scars to various parts of her body, severe and permanent injuries to her right leg and back, hearing loss, foot pain, and PTSD. *Id.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #13. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #13. *Id.*

**Attack #14 (April 5, 2005, Parwan Province, Afghanistan).** Plaintiff Justin L. Shellhammer ("Shellhammer") is a national of the United States and served in the Army. *Ex.14.* On April 5, 2005, the Bagram Air Base in Parwan Province, Afghanistan came under mortar attack. *Id.* After the attack, Shellhammer as Squad Leader of the Quick Reaction Force ("QRF"), was tasked with locating and taking care of the mortar threat. *Id.* When they got to the grid where the mortars were coming from, Shellhammer and the QRF squad dismounted their trucks and went down a dirt trail to locate the target. *Id.* At some point, Shellhammer saw a mortar sticking out of the ground, and did a controlled halt. *Id.* Shellhammer injured himself when a blew up causing Shellhammer to instantly lose his left leg below his knee. *Id.* Shellhammer also sustained PTSD, tinnitus, injuries to his lumbar back, right shoulder, right and left lower leg, right hip, and right and left knee. *Id.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #14. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #14. *Id.*

**Attack #15 (March of 2006, East Paktika, Afghanistan).** Plaintiff Terry De Andre Flood ("Flood") is a national of the United States and served in the Army. *Ex. 5*. In March of 2006, Flood was getting off a helicopter at FOB Shank in East Paktika, Afghanistan when a terrorist fired rocket landed five meters from where he was operating, thereby exposing him to the blast and causing him to fall to the ground. *Id.* Flood blacked out from the blast and was taken to FOB Shank to treat for his injuries. *Id.* Flood sustained a traumatic brain injury and PTSD. *Ex. 5*.

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #15. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #15. *Id*.

**Attack #16 (October 10, 2010, Puli Alam, Afghanistan).** Plaintiff Oren D. Gingrich ("Gingrich") is a national of the United States and served in the Army. *Ex. 6*. On October 10, 2010, Gingrich was walking across "Harball Utah" at FOB Shank in Puli Alam, Afghanistan for guard duty at CRSP yard, when a terrorist modified mortar round detonated knocking Gingrich to the ground causing loss of consciousness. *Id.* Gingrich sustained a traumatic brain injury, PTSD, seizures, and disc disease. *Id*.

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #16. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #16. *Id*.

**Attack #17 (October 29, 2010, Kandahar, Afghanistan).** Plaintiff Lonnie J. Turney ("Turney") is a national of the United States and served in the Navy. *Ex.16*. On October 29, 2010, Turney was walking from chow on the Kandahar Airforce base in Kandahar, Afghanistan when a terrorist fired rocket hit approximately 30 meters away from him. *Id.* Turney sustained shrapnel wounds to his right lung, PTSD, injuries to his leg, and hearing loss. *Id.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #17. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #17. *Id*.

**Attack #18 (May 7, 2011, Paktika Province, Afghanistan).** Plaintiff Roger A. Lobato Jr. ("Lobato") is a national of the United States and served in the Army. *Ex. 9a*. On May 7, 2011, Lobato was traveling as a gunner in a lead scout truck coming from dropping off a host Afghan national at FOB Sharana in the Paktika Province, Afghanistan and heading toward Bagram Airfield, when a terrorist detonated a 700 to a 1,000-pound IED. *Id.* During the attack, Lobato was knocked unconscious for 2-5 minutes. *Id.* Lobato sustained an open head wound, a traumatic brain injury, PTSD, tinnitus, and a back injury. *Id.* Lobato received a Purple Heart for his injuries from the attack. *Id.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #18. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #18. *Id*.

**Attack #19 (June 28, 2012, Kabul, Afghanistan).** Plaintiff Joshua W. Fisher ("Fisher")

is a national of the United States and served in the Army. *Ex. 4.* On June 28, 2012, Fisher was the top gunner in the lead vehicle of a convoy that departed Bagram Air Base and headed south through Kabul, and toward FOB Shank in the Logar Province of Afghanistan. *Id.* Just as the convoy was outside the city limits of Kabul, the vehicle Fisher was in ran over a terrorist placed IED causing the vehicle to rollover and Fisher to lose consciousness. *Id.* After the attack, Fischer continued in and out of consciousness as he was transported to FOB Shank, Bagram Air Base, Landstuhl, Germany, and then to Walter Reed National Military Medical Center in Bethesda, MD for his injuries. *Id.* Fischer sustained a traumatic brain injury, fractures to right knee and ankle, adjustment disorder with mixed anxiety (PTSD), scarring, and pain. *Ex. 4.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #19. *Ex. 20a.* Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #19. *Id.*

### This Lawsuit

On May 12, 2021, Plaintiffs filed their Complaint. [Doc. 1]. That complaint and summons were delivered to the Iranian Ministry of Foreign Affairs on March 2, 2022. [Doc. 20]. The clerk issued a default on May 3, 2022. [Doc. 22]. On September 1, 2022, Plaintiffs filed their original Motion for Default Judgment Regarding Liability and supporting evidence including Plaintiffs' declarations (Exhibits 1-19) filed under seal, and their expert, Michael Pregent's declaration and C.V. (Exhibit 20-21). [Docs. #27-28, 30]. On December 28, 2022, this Court entered an order denying Plaintiffs' Motion for Default Judgment without prejudice, and provided Plaintiffs' leave to file their Renewed Motion for Default Judgment by March 30, 2023. [Doc. 88]. In the Order, this Court requested more information – to the extent any exists – regarding the attacks involving mortars, IEDs, RPGs, or indirect fire where no terrorist group claimed responsibility and there was no signature Iranian weapon. Specifically, the Court identified Attacks 2, 3, 4, 7, 8, 9, 10, 11, 12, 17, 18, 19. [Doc. 88]. On March 30, 2023, Plaintiffs filed their Renewed Motion and Memorandum in Support of the Entry of Default Judgment Against the Islamic Republic of Iran ("Iran"). [Doc. XX].

### CONCLUSIONS OF LAW

Having made findings of fact, the court next answers three questions of law: (1) whether there is subject matter jurisdiction over the dispute; (2) whether the court has personal jurisdiction over Iran; and (3) whether Iran is liable for Plaintiffs' injuries.

### Subject Matter Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hesse Shipping Corp.*, 488 U.S. 428, 434 (1989). "Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions ...." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). Pursuant to what is known as the terrorism exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

There is no doubt that Plaintiffs seek money damages against a foreign state. [Doc. 1, ¶2]. Plaintiffs seek to recover for their personal injuries, including "their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses …." [Doc. 1, ¶269]. In addition, Plaintiffs' claims are predicated on Iran's "material support or resources" for an extrajudicial killing.

An "extrajudicial killing" is a killing, that is deliberated, and is not authorized by a previous judgment pronounced by a regularly constituted court or lawfully carried out under authority of a foreign nation. 28 U.S.C. § 1605A(h)(7); *Owens*, 864 F.3d at 770. An extrajudicial killing includes "'deliberated' attempts to kill …." *Karcher, 396 F. Supp. 3d at 58* (citing *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); and *Roberts v. Islamic Republic of Iran*, No. 1:20-CV-1227-RCL, 2022 WL 203540 (D.D.C. Jan. 24, 2022)). As a result, a court has jurisdiction "where a designated state supplies material resources in an attempt to commit an extrajudicial killing." *Lee*, 518 F. Supp. 3d at 491.

There is no doubt that Defendant Iran "conducted a war" against America by fueling terrorist activities designed to kill, kidnap, and or take hostage Americans. [3] "Iran has conducted this war primarily using the Islamic Revolutionary Guard Corps Qods Force (IRGC-QF) and the Iranian proxy Lebanese Hezbollah. Both have been engaged in direct military action; and both have cultivated and supported military action abroad by other proxies, mainly through the use of terrorist bombings, abductions and assassinations. The killing of U.S. soldiers in Iraq and Afghanistan serves a strategic goal." *Id.*

According to the "AlQaeda Handbook"[4], a computer file found by Police during a search of the Manchester home of Anas al-Liby in 2000, the "main mission" of these terrorist activities

---

[3] "Killing Americans and their Allies: Iran's Continuing War against the United States and the West", by Col. Richard Kemp (ret.), Former Commander of British Forces in Afghanistan, and Major (ret.) Chris Driver-Williams, Former U.K. Special Forces, https://jcpa.org/killing-americans-allies-irans-war/

[4] "Al Qaeda Manual Drives Detainee Behavior at Guantanamo Bay", by Donna Miles, American Forces Press Service, June 29, 2005, https://web.archive.org/web/20080917194749/http://www.defenselink.mil/news/newsarticle.aspx?id=16270

is to "overthrow of the godless regimes and their replacement with an Islamic regime" by "2) kidnaping enemy personnel, documents, secrets, and arms; 3) assassinating enemy personnel as well as foreign tourists […]; 7) blasting and destroying the embassies and attacking vital economic centers; 8) blasting and destroying bridges leading into and out of the cities. […]." [5]

These attacks were all part of Iran's "war" on Americans.  Moreover, the attacks at issue all involved extrajudicial killings.  While Attack 1, 5, 6, and 13, resulted in actual deaths, the evidence confirms that each and every attack was, at a minimum, an attempt to kill.  Furthermore, a "'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 518 F. Supp. 3d at 492.  The evidence confirms that each attack involved deliberate and strategic attempts to kill.  There is simply no evidence to suggest that any of these attacks were "on a sudden impulse;" rather, they were all part of a terror campaign.  Finally, there is no evidence that the attempted killings were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation.

The FSIA next requires that an official or agent of Iran provided "material support or resources" to the people who carried out the attacks at issue.  28 U.S.C. § 1605A(a)(1).

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials[.]

28 U.S.C. § 1605A(h)(3) (adopting the definition of 18 U.S.C. § 2339A(b)(1)).  The evidence contains numerous examples of Iran funneling material support and resources through its Ministry of Intelligence and Security and its Qods Force to terrorist proxies in Iraq and Afghanistan.  The Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *Lee*, 518 F. Supp. 3d at 493.

The FSIA also requires that Iran's "provision of material support or resources" *caused* Plaintiffs' "personal injury or death."  28 U.S.C. § 1605A(a)(1).  The touchstone of proximate causation is the existence of "'some reasonable connection between the act ... of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128).  "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury. Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.*

Plaintiffs have satisfied both components of proximate cause. First, Iran's support and resources were "substantial factors" leading to Plaintiffs' injuries because Iran provided the funding, training, and weaponry that was used to kill and/or injure Plaintiffs.  Second, Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct.  It is clear from Iran's

---

[5] "The AlQaeda Manual" at p. 13, https://www.satp.org/Docs/Document/655.pdf

financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq and Afghanistan that Iran reasonably anticipated—and indeed, intended—that its support and resources would lead to death and serious injury. *See Karcher*, 396 F. Supp. 3d at 56–57 (finding harm to plaintiffs was reasonably foreseeable consequence when Iran intended "to kill people, not just disable vehicles"); *see also Owens*, 864 F.3d at 797–98 (finding bombings were reasonably foreseeable consequence of Sudan's provision of "opportunities" to al-Qaeda and Osama bin Laden (internal quotation marks omitted)). Likewise, the suffering of the families of victims of Iran-supported attacks was a reasonably foreseeable consequence of Iran's support and resources for terrorist attacks in Iraq and Afghanistan. *See Salzman*, 2019 WL 4673761, at *14 (finding "the related suffering of [victims'] family members" was "reasonably foreseeable").

Finally, a court shall hear the claim if: (1) "the foreign country was designated a state sponsor of terrorism" at the time of the act, due to the act, or within 6 months before the claim was filed, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) the claimant or the victim was a national, member of the armed forces, or an employee or contractor of the United States at that time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III); and (3) the claimant afforded the foreign state a reasonable opportunity to arbitrate when "the act occurred in the foreign state …." 28 U.S.C. § 1605A(a)(2)(A)(iii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13-14 (D.C. Cir. 2015). Plaintiffs satisfy these requirements too. First, Iran has been continuously designated as a state sponsor of terrorism since 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836, 2,836 (Jan. 23, 1984). Second, Plaintiffs have submitted under seal documentation establishing that they are U.S. nationals and/or served in the armed forces. *See Exs. 1-19.* Third, all of the attacks occurred in Iraq or Afghanistan—not Iran—so the requirement to afford Iran the opportunity to arbitrate is not implicated here.

The court therefore concludes that Iran's material support for the extrajudicial killing involved in the attacks proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

## **Personal Jurisdiction**

As with subject matter jurisdiction, the court has "an independent obligation ... to satisfy itself of its personal jurisdiction before entering a default against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018). Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608. 28 U.S.C. § 1330(b). "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA provides four means for serving a foreign state. *See* 28 U.S.C. § 1608(a). First, a plaintiff may affect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* § 1608(a)(1). If service cannot be made under such an arrangement, then the plaintiff may affect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt

to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If, after thirty days, service cannot be affected by this third option, the plaintiff must attempt service through diplomatic means. To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4). The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs could not serve Iran under the first two mechanisms of service, as the United States and Iran do not have a "special arrangement" for service and "'Iran is not party to an international convention on service of judicial documents.'" *Salzman*, 2019 WL 4673761, at \*15 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). Plaintiffs therefore first attempted to effect service under the third mechanism—via registered mail with return receipt requested. [Docs. 10, 11, 13]. When Iran did not respond after 30 days, Plaintiffs served Iran via diplomatic channels. [Docs. 15-16]. Under 28 U.S.C. § 1608(c)(1), service was deemed effected "as of the date of transmittal indicated in the certified copy of the diplomatic note"—in this case, March 2, 2022. [Doc. 20]. Accordingly, this court finds that Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the court concludes that it has subject matter jurisdiction and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran. *See GSS Grp.*, 680 F.3d at 811.

### Liability

Plaintiffs bring their claims under 28 U.S.C. § 1605A(c). [Doc. 1]. Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c).

Liability is limited, however, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals. *Id.* The court has already found that Plaintiffs satisfied this requirement.

Regarding liability, "[t]here is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman*, 2019 WL 4673761, at \*15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at \*6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87; *Lee*, 518 F. Supp. 3d at

495. The court has already concluded that it has subject matter jurisdiction over Plaintiffs' claims under the terrorism exception. Accordingly, the court also concludes that Iran is liable for Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

In finding that Iran is liable for Plaintiffs' injuries, the court also takes judicial notice pursuant to Federal Rule of Evidence 201(b) of *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB and *Selig v. Islamic Republic of Iran*, 2021 WL 5446870, ---- F.Supp.3d ---- (D.D.C. November 22, 2021). In both cases, the court found Iran had provided material support to the Taliban in Afghanistan.

Moreover, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding Iran liable for their injuries. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012). Courts define the theory of "personal injury" needed to prevail on a § 1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery." *Oveissi, supra at 54;* see also *Fraenkel v. Islamic Repub. of Iran, et al.,* 892 F.3d 348, 353 (D.C. Cir. 2018). Plaintiffs have presented overwhelming evidence that Iran provided material support for the attacks that caused Plaintiffs' harm. These terrorist acts include conduct that satisfies all the elements of the Plaintiffs' tort claims for assault, battery, and intentional infliction of emotional distress, according to the elements articulated by the Restatement (Second) of Torts. Am. Compl. ¶¶ 34-39.

## CONCLUSION AND ORDER

For the foregoing reasons, the court grants Plaintiffs' renewed motion for default judgment against Defendant. Having found that Defendant is liable, this case shall proceed to the determine the damages of Plaintiffs.

SIGNED this _____ day of _____, 2023.

_____
UNITED STATES DISTRICT JUDGE

Distribution list:

To all registered counsel by CM/ECF

Bradley M. Lakin
Bradl@ChampionsForTheInjured.com