**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CEDRIC M. BROWN**, *et al.*,<br><br>            Plaintiffs,<br><br>            v.<br><br>**ISLAMIC REPUBLIC OF IRAN**,<br><br>            Defendant. | Case No. 1:21-cv-1308 (TNM) |

**MEMORANDUM OPINION**<sup>∗</sup>

This lawsuit arises under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A.  It concerns terrorist attacks in Iraq and Afghanistan.  Seventeen soldiers, two government contractors, and their relatives sue the Islamic Republic of Iran for personal and emotional injury stemming from the attacks.  They allege that Iran provided material support to terrorist groups in Iraq and Afghanistan who committed the attacks.

Iran did not appear or respond, and Plaintiffs now move for default judgment.  Plaintiffs have successfully established personal and subject matter jurisdiction under § 1605A.  And they prove that Iran is liable under federal law.  The Court will also award Plaintiffs compensatory and punitive damages, though in lesser amounts than some requested.  The Court will thus grant in part and deny in part the motion for default judgment.

---

∗ The Court replaces Plaintiffs' names with letters of the alphabet to protect their privacy in light of the sensitive medical information they provide.  A Sealed version of this Opinion issued on July 27, 2023.

## I.   BACKGROUND

At issue are 19 attacks that occurred in Iraq and Afghanistan between 2004 and 2012. *See* First Amended Exp. Witness Rep. of Michael Pregent (Pregent Rep.) ¶¶ 108–71, 183–208, ECF No. 34-3; Amended Exp. Witness Rep. of Michael Pregent Regarding Attack #9 (Suppl. Pregent Rep.), ECF No. 43.  Plaintiffs allege that a slew of terrorist groups—notably al-Qaeda in Iraq and the Taliban in Afghanistan—committed the attacks with material support from Iran. *See* Compl. ¶¶ 67–265, ECF No. 1.  Material support includes both provision of weaponry and tactical training on how to use it against American soldiers.

The FSIA "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . [but] that grant of immunity is subject to a number of exceptions."  *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  One of these exceptions, known as the "terrorism exception," waives sovereign immunity for countries that provide material support to terrorist organizations.  *See* 28 U.S.C. § 1605A.  Plaintiffs sue under this exception.  *See* Compl. ¶ 1.

Because Iran did not respond, Plaintiffs move for default judgment.  Before the Court can enter judgment, Plaintiffs must establish subject matter and personal jurisdiction.  *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014).  Plaintiffs may establish both types of jurisdiction by properly pleading all elements of a § 1605A claim.  To do this, Plaintiffs must identify the terrorist groups responsible for the attacks and show that Iran supported them.

Plaintiffs provide two types of evidence.  First, they provide expert testimony.  Plaintiffs' expert, former U.S. intelligence officer Michael Pregent, submitted a report and testified at an evidentiary hearing.  *See generally* Pregent Rep.; 6/22/23 Tr. of Evidentiary Hr'g (Hr'g Tr.).  At that hearing, the Court recognized Pregent as an expert in military intelligence within Iraq and

Afghanistan and terrorism under Federal Rule of Evidence 702.  *See* Hr'g Tr. at 4–5.  Pregent has submitted reports and testified in several other FSIA cases in this district involving Iran and provided declarations in two others related to Yemen.  *See* Pregent Rep. ¶ 2 (listing cases); *see also, e.g.*, *Frost v. Islamic Repub. of Iran*, 383 F. Supp. 3d 33, 38 (D.D.C. 2019) (qualifying Pregent as an expert on "Iranian influence in Iraq"); *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 19 (D.D.C. 2019) (qualifying Pregent to testify "regarding 'intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field'").  In FSIA cases, expert testimony is often sufficient for plaintiffs to meet their burden because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).

Second, Plaintiffs ask the Court to take judicial notice of prior decisions by courts in this district that have held Iran responsible under § 1605A on similar facts.  *See* Pls.' Renewed Mem. in Supp. of Pls.' Mot. for Default J. (Pls.' Mem.) at 5–6, ECF No. 33.  Federal Rule of Evidence 201(b) permits courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "either (1) generally known within the territorial jurisdiction . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also Rimkus v. Islamic Repub. of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (noting courts can rely on evidence presented in earlier FSIA litigation to reach independent findings of fact).  The Court will thus take judicial notice of the cases Plaintiffs cite, *see* Pls.' Mem. at 5–6, including its prior decision and Pregent's testimony in *Roth v. Islamic Repub. of Iran*.  *See* No. 19-cv-2179, 2023 WL 196577 (D.D.C. Jan. 17, 2023); *Roth* Tr. of Evidentiary Hr'g (*Roth* Hr'g Tr.), ECF No. 102.  This is not to say that the Court

automatically accepts all findings or assertions in these prior cases; it merely considers them relevant.

## I.    FINDINGS OF FACT

### A.    Iran's Support for Terrorism

The Court recently detailed Iran's extensive sponsorship of terrorist groups. *See Roth*, 2023 WL 196577, at *2–5. The Court incorporates those facts by reference and recounts a few.

After the Iranian revolution in 1979, the new Supreme Leader Ayatollah Khomeini created the Islamic Revolutionary Guard Corps (IRGC). *See Karcher*, 396 F. Supp. 3d at 22. The IRGC helped Khomeini install a theocratic Islamic government in Iran. *See id.* It created the Quds Force[1] and tasked it with overseeing international operations. *See id.* The Quds Force trained many other terrorist groups on insurgency and terrorism. *See id.* Gen. Qasem Soleimani led the Quds Force until U.S. forces killed him in 2020. *See, e.g.*, *U.S. Kills Top Iranian General in Baghdad Air Strike*, BBC News, (Jan. 3, 2020), https://perma.cc/N4Y6-GGW6. As Pregent explained, the Quds Force is a "hybrid intelligence service and special operations service. And it is one of the most capable entities that the U.S. military has faced." *Roth*, 2023 WL 196577, at *2 (cleaned up).

One terrorist group the Quds Force supports is Lebanese Hezbollah. *See id.* Hezbollah is the Quds Force's "premier proxy" in the Middle East. *Id.* In return for Hezbollah's pledge of allegiance, Iran "bankrolled, armed, and trained" its members. *Lee v. Islamic Repub. of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021) (cleaned up). Iran's support to Hezbollah began as early as the 1990s. *See* Pregent Rep. ¶¶ 42–44. Hezbollah also established a connection with al-Qaeda, a terrorist group founded by Osama bin Laden, around that time. *See id.* ¶ 38. Their

---

[1] Sometimes spelled Qods Force.

senior leaders began meeting soon after to plot terrorist attacks throughout the Middle East. *See id.* ¶¶ 39–41. Hezbollah is responsible for persuading al-Qaeda that suicide bombings—which the group had frowned upon for religious reasons—are justified and appropriate acts of jihad. *See id.* ¶ 41; *Roth*, 2023 WL 196577, at *3.

Osama bin Laden sent many terrorist operatives to train at Hezbollah camps in both Lebanon and Iran. *See* Pregent Rep. ¶¶ 43–45. Explosives training was a key focus. *See id.* Common weapons terrorists learned to build and deploy were improvised explosive devices (IEDs). *See id.* ¶¶ 45, 47. Terrorists also learned how to engage in intelligence operations to target Americans. *See id.* ¶¶ 43–45. The IRGC helped coordinate these camps, and at "all times, Iran's Supreme Leader was aware of [them] and approved[.]" *Id.* ¶ 44.

These Iranian-trained forces were active in Iraq before the United States invaded in 2001. *See Lee*, 518 F. Supp. 3d at 482. And after 2001, Iran increased its support. *See* Pregent Rep. ¶ 48. The Quds Force freed many jihadists in Iranian prisons, unleashing them on U.S. forces in Iraq. *See id.* Additionally, the Quds Force provided a new leader—Abu Musab al-Zarqawi— with funds, weapons, and safe passage into Iraq to target Americans. *See id.* ¶ 49; *Roth*, 2023 WL 196577, at *5 (explaining that after the United States captured bin Laden and raided his compound, soldiers found evidence that the Quds Force trained Zarqawi). He had founded a jihadist terrorist group called Jamaat al-Tawhid wa al-Jihad (JTJ). *See* Pregent Rep. ¶ 110. Zarqawi eventually became al-Qaeda in Iraq (AQI)'s leader. *See id.* ¶ 52.

The story of Iranian influence in Afghanistan is similar. Iran provided lethal aid in many forms to the Taliban and the Haqqani network to attack Americans.[2] *See id.* ¶¶ 63–71. The State

---

[2] As this Court recognized in a prior case, the Taliban and the Haqqani network largely "operate as a single entity." *Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40, 52 (D.D.C. 2021).

Department has recognized that "since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets," and more to the Taliban. *Id.* ¶ 64. The Quds Force also provided training on these weapons and various attack strategies. *See id.* ¶¶ 69, 71. When intelligence agencies gathered documents from bin Laden's compound in 2011, they found even more evidence that Iran "facilitated the movement of operatives in Afghanistan[.]" *Roth*, 2023 WL 196577, at *5.

In sum, Iran's support for terrorism has been far-reaching and effective. Iran's provision of support to proxy groups allowed it to be the puppet master behind the curtain instigating what U.S. intelligence originally believed were unrelated terrorist attacks in Iraq and Afghanistan. *See, e.g.*, *Roth* Hr'g Tr. at 6–7, 25–26. Plaintiffs are victims of these attacks.

### B.    Attacks Against Plaintiffs

Plaintiff's expert Michael Pregent studied each attack to assess whether it could be traced to Iran's material support. *See* Pregent Rep. ¶¶ 102, 180. And his assessment of Iran's involvement is "within a reasonable degree of military intelligence and counter-insurgency certainty." *Id.* ¶¶ 102–03, 180–81. Pregent's methodology is multi-faceted. He looked to where each attack took place, the date, the weaponry used, the complexity of the attack, what group controlled the region, other nearby terrorist attacks, where ammunition caches were discovered, and more. *See generally id.* ¶¶ 75–77, 108–71, 183–208. He then compared those data with other information, including any official military reports of "significant event[s] or significant activit[ies]" in the vicinity, called "SIGACTS." *Id.* ¶ 105.[3]

---

[3] Some SIGACT records derive from the Wikileaks database. *See* Pregent Rep. ¶ 105. Pregent explained in *Roth v. Islamic Republic of Iran* that he searched this database because he no longer has a security clearance. *See* 2023 WL 196577, at *6 n.6. Pregent is able to identify which WikiLeaks records are official State Department or Multinational Forces documents based on his experience looking at similar files while working in government. *See id.* While the Court is

Pregent also reviewed Plaintiffs' declarations and the soldiers' DD214 forms—the official documents detailing their service records. *See id.* ¶ 74. In reviewing these documents, he was able to determine the location and missions of various Plaintiffs when they were attacked. *See id.* ¶ 77. Pregent's research led him to revise the specifics of some attacks and to discount others. *See, e.g., id.* ¶ 108 & n.72 (refusing to credit soldier declaration that attack involved a type of weapon); *id.* ¶ 119 & n.73 (declining to discuss certain attacks for a Plaintiff). Pregent testified that he focused on the attack in each declaration (if there were multiple) that had the most corroborating evidence. *See* Hr'g Tr. at 53. Where Pregent's expert conclusions diverged from Plaintiffs' submissions, the Court relies on his report and testimony.

The Court now summarizes the various attacks at issue.[4] It begins with "complex" attacks (involving multiple weapons and advanced planning) and those using signature Iranian attack methods. Then the Court discusses attacks involving IEDs and a landmine. Finally, it explains attacks involving RPGs, rockets, and mortars.

### 1. "Complex" Attack or Signature Attack Methods

First up are three attacks that Pregent labeled "complex." Complex attacks involve multiple weapons systems (such as an IED and an RPG) and are sustained over time. *See Roth*, 2023 WL 196577, at *8; *Roth* Hr'g Tr. at 30–31, 66. Such attacks often also show evidence of

---

unaware of any courts finding Wikileaks to be a credible source, it follows its reasoning in *Roth* and reluctantly accepts Pregent's analysis given the lack of contrary evidence from Iran. *See id.*

[4] All Plaintiffs are U.S. citizens who served in various military or Government contractor roles. The Court thus does not rehash that information for each Plaintiff.

advanced planning to inflict maximum casualties.  *See Roth*, 2023 WL 196577, at *17; *Roth* Hr'g
Tr. at 76.

*Attack #1*:  Terrorists attacked Plaintiff A in June 2004 while he was driving in a vehicle
convoy in Baqubah, Iraq, to clear IEDs.  *See* Decl. of A ¶ 6, ECF No. 30-18; Pregent Rep. ¶ 108.
He was beset by "small arms fire, RPGs, and daisy chained IEDs."  Pregent Rep. ¶ 108.  A lost
consciousness during the attack and suffered a traumatic brain injury (TBI), shrapnel and
gunshot wounds, burns, and vision and hearing loss.  *See* A Decl. ¶¶ 7, 10–11.  He was later
diagnosed with post-traumatic stress disorder (PTSD).  *See id.*  Terrorist group JTJ, an AQI
affiliate, took credit for this attack.  *See* Pregent Rep. ¶¶ 108–09.

*Attack #6*:  Plaintiff B was attacked while on patrol near Fallujah, Iraq, in September
2005.  *See* Decl. of B ¶ 5; Pregent Rep. ¶ 137.  Terrorists directly hit his vehicle with an IED and
RPG.  *See id.*  B lost consciousness.  *See* B Decl. ¶¶ 5, 9.  He was diagnosed with tinnitus, PTSD,
lumbar strain, and neuropathy.  *See id.* ¶ 8.  He also continues to suffer from flashbacks, memory
problems, anxiety, and depression.  *See id.* ¶ 9.

*Attack #13*:  Plaintiff C, a government contractor, was attacked in February 2004 while
working to build schools and health clinics in Afghanistan.  *See* First Am. Decl. of C ¶¶ 1–2,
ECF No. 34-2; Pregent Rep. ¶ 183.  Terrorists started shooting at her helicopter while it was
taking off for a village clinic.  *See* C Decl. ¶ 7.  An RPG struck the helicopter's tail, causing it to
fall to the ground, and bullets rained into the cabin.  *See id.*  C was struck three times in the torso
and once in the leg.  *See id.* ¶ 8.  She was transported to several hospitals for emergency
surgery before being airlifted back to the United States.  *See id.* ¶¶ 9–10.  Her shrapnel and
gunshot wounds caused lasting scars, plus "severe and permanent injuries" to her right leg and

back. *Id.* ¶ 11. C has also been diagnosed with hearing loss, foot pain, and PTSD from the attack. *See id.*

Next up are two attacks involving VBIEDs—explosive devices carried by vehicles. The VBIED is one of AQI's signature attack methods. *See* Pregent Rep. ¶¶ 122, 132.

*Attack #3*: Plaintiff D worked as a Department of Justice official providing security and witness protection services in Baghdad, Iraq. *See* Decl. of D ¶ 1, 5, ECF No. 30-2; Pregent Rep. ¶ 119. In November 2005, he was injured by two suicide bombers detonating VBIEDs in an "al-Qaeda stronghold." Pregent Rep. ¶ 119. A SIGACT report confirms the time, location, and weapons used in this attack. *See* ECF 32-3. D suffers from PTSD as a result of it. *See* D Decl. ¶ 16.

*Attack #5*: Plaintiff E was on a routine mission with his unit in May 2005 outside of Camp Habbaniyah in Afghanistan. *See* Decl. of E ¶ 6, ECF No. 30-14; Pregent Rep. ¶ 132. The soldiers passed a stopped taxi with a pregnant woman inside whom E stopped to assist. *See* E Decl. ¶ 6. As he was providing medical assistance, a terrorist remotely detonated a bomb in the vehicle. *See id.* E was thrown from the car and landed on his head, neck, and shoulder. *See id.* He was diagnosed with a TBI and post-concussion syndrome, which causes him chronic migraines. *See id.* ¶ 8. He also suffers from tinnitus and PTSD. *See id.* ¶¶ 8, 11.

### 2. IED and Landmine Attacks

The attacks below involved either IEDs or a landmine. IEDs are "sophisticated weapons systems" that terrorist groups are trained to "emplace and trigger." *Roth*, 2023 WL 196577, at *18. They can be triggered on command (someone flipping a switch at the right time), or

through passive detonation (a truck driving over one). *See id.* Landmines operate similarly and are triggered when pressure is placed on them. *See* Hr'g Tr. at 15–18.

*Attack #2*: Plaintiff F was patrolling in Al Anbar Province in Iraq in August 2004 when the lead vehicle in his convoy hit an IED. *See* Decl. of F ¶ 6, ECF No. 30-9; Pregent Rep. ¶ 114. F returned with his unit the next day to recover the disabled vehicle. *See* F Decl. ¶ 7. While on that mission, he sustained a direct hit from another IED. *See id.* He received shrapnel wounds to his chin and left arm. *See id.* F has also been diagnosed with a mood disorder, migraines, tinnitus, and planter fasciitis from the attack. *See id.* ¶ 10.

*Attack #4*: Plaintiff G was driving in a convoy outside of Ramadi, Iraq, in January 2005 when it was hit with an IED. *See* Decl. of G ¶ 7, ECF No. 30-1; Pregent Rep. ¶ 126. Soon after, he was diagnosed with a TBI, PTSD, tension headaches, knee conditions, and tinnitus. *See* G Decl. ¶ 10.

*Attack #7*: Plaintiff H was driving at the end of a three-vehicle convoy outside of Fallujah, Iraq, in March 2006. *See* Decl. of H ¶ 7, ECF No. 30-6; Pregent Rep. ¶ 142. While the vehicles were crossing a bridge, an IED was detonated underneath the middle vehicle. *See* H Decl. ¶ 7. Data in a SIGACT entry matches the information H recalls from the attack. *See* ECF No. 32-6. He suffered a TBI, spinal cord injury, left shoulder strain, and more. *See* H Decl. ¶¶ 10, 14. He also lives with PTSD and headaches. *See id.*

*Attack #8*: Plaintiff I was on a mission from Mahmudiyah base in Babil Province, Iraq, in April 2006 when he was attacked. *See* Decl. of I ¶ 6, ECF No. 30-10; Pregent Rep. ¶ 147.[5] While he and his unit were driving to install a clandestine cellular monitoring device, his vehicle

---

[5] At one point, I's declaration lists "April 2007" as the date of the attack, but from context it is clear he is referring to an earlier-discussed April 2006 attack. *See* I Decl. ¶ 11; Pregent Rep. at 32 n.74. This slight discrepancy does not undermine his credibility.

was hit by an IED. *See* Perry Decl. ¶ 6. The IED detonated right under him, causing him to be crushed by the vehicle door. *See id.* He sustained a TBI, plus various injuries to his back and shoulder. *See id.* ¶ 9. He also suffers from PTSD, migraines, and tinnitus. *See id.*

*Attack #10*: Plaintiff J was on a patrol mission from Camp Taji in Sadr City, Iraq, in March 2008. *See* Decl. of J ¶ 4, ECF No. 30-7; Pregent Rep. ¶ 159. An IED placed between two houses detonated as they approached. *See* J Decl. ¶ 4. He was knocked to the ground and suffers back injuries. *See id.* ¶¶ 4, 8. He also lives with PTSD, hearing loss, and tinnitus. *See id.*

*Attack #12*: Plaintiff K was the gunman in a vehicle convoy in Kirkuk, Iraq, in November 2010. *See* Decl. of K ¶ 4, ECF No. 30; Pregent Rep. ¶ 166. His vehicle was struck by an IED. *See* K Decl. ¶ 4. Its blast caused shrapnel wounds to his face and injuries to his back, shoulders, and wrist. *See id.* ¶ 5, 7. He was later diagnosed with PTSD and a knee condition. *See id.* ¶¶ 6–7.

*Attack #14*: Plaintiff L was serving as a Squad Leader on Bagram Airforce Base in Afghanistan in April 2005. *See* Decl. of L ¶ 6, ECF No. 30-13; Pregent Rep. ¶ 186. Terrorists suddenly began attacking the base with mortars. *See* L Decl. ¶ 6. So L and his soldiers went out to combat them. *See id.* As they were approaching the terrorists, L saw a mortar sticking out of the ground. *See id.* ¶ 7. He ordered his men to stop, but one bumped into him causing him to lose his balance. *See id.* L then stepped on a landmine. *See id.* It exploded, instantly severing his left leg below the knee. *See id.* L also suffers from PTSD, tinnitus, and injuries to his back, right shoulder, hip, and knees. *See id.* ¶¶ 9–10. He received a Purple Heart for his injuries. *See* Pregent Rep. ¶ 186.

*Attack #18*: Plaintiff M was traveling as a gunner in a scout truck headed toward Bagram Airfield in Afghanistan in May 2011. *See* First Am. Decl. of M ¶ 5, ECF No. 34-1. While they

were driving a terrorist detonated an IED nearby.  *See id.*; Pregent Rep. ¶ 202.  M blacked out for several minutes from the blast.  *See* M Decl. ¶ 6.  He sustained an open head wound and was diagnosed with a TBI, PTSD, tinnitus, and a back injury.  *See id.* ¶¶ 6, 8.

*Attack #19*:  Plaintiff N was the top gunner in a convoy's lead vehicle near Kabul, Afghanistan, in June 2012.  *See* Decl. of N ¶ 5, ECF No. 30-3.  His vehicle was providing security for others when it ran over an IED.  *See id.* ¶ 6; Pregent Rep. ¶ 205.  The IED exploded, flipping the vehicle.  *See* N Decl. ¶ 6.  N lost consciousness and was transported to various hospitals for care.  *See id.* ¶¶ 6–8.  He suffered fractures to his right knee and ankle, a TBI, PTSD, and scarring.  *See id.* ¶ 8, 10–11.

### 3.    RPG, Rocket, and Mortar Attacks

Last are the RPG, rocket, and mortar attacks.  RPGs are shoulder-fired weapons systems, while rockets and mortars involve stabilizing plates placed on the ground into which fired explosives are loaded.  *See* Hr'g Tr. at 23, 26.  Both require training to be used accurately.  *See id.* at 27.

*Attack #9*:  Plaintiff O was performing a route-clearing mission around Baghdad, Iraq, in June 2007.  *See* Decl. of O ¶ 6, ECF No. 30-16; Suppl. Pregent Rep. ¶ 1.  When he stopped to investigate a potential roadside IED, an RPG struck his vehicle.  *See* O Decl. ¶ 6.  A SIGACT entry matches O's description of events.  *See* ECF No. 32-8.  He suffered shrapnel wounds and was later diagnosed with tinnitus, PTSD, and anxiety.  *See* O Decl. ¶¶ 9–10.

*Attack #11*:  Plaintiff P was working as a civilian contractor at Camp Taji in Iraq in October 2008.  *See* Decl. of P ¶ 8, ECF No. 30-11; Pregent Decl. ¶ 163.  While he was loading helicopters with materials and supplies, a terrorist-fired mortar exploded nearby.  *See* P Decl. ¶

8.[6]  He now suffers from a TBI, PTSD, affective mood disorder, back injuries, whiplash, tendonitis, and hearing loss.  *See id.* ¶ 11.

*Attack #15*:  Plaintiff Q was serving on Shkin base in Afghanistan in March 2006.  *See* Decl. of Q ¶ 5, ECF No. 30-4; Pregent Rep. ¶ 190.  He was exiting a helicopter when a rocket landed nearby.  *See* Q Decl. ¶ 5.  It exploded, causing him to fall to the ground and black out. *See id.*  He suffered a TBI and a laceration on the right side of his forehead.  *See id.* ¶¶ 9–10.  He continues to suffer from PTSD.  *See id.*

*Attack #16*:  Plaintiff R was working on Shank base in Afghanistan in October 2010.  *See* Decl. of R ¶ 5, ECF No. 30-5.  He was walking across the yard for guard duty when a mortar detonated nearby.  *See id.*; Pregent Rep. ¶ 195.  It caused him dizziness and almost caused him to black out.  *See* R Decl. ¶ 6.  He was diagnosed with a TBI, PTSD, seizures, and disc disease after the attack.  *See id.* ¶¶ 7–9.

*Attack #17*:  Plaintiff S was walking on the Kandahar Air Base in Afghanistan in October 2010.  *See* Decl. of S ¶ 5, ECF No. 30-15.  Suddenly, a terrorist fired a rocket that hit nearby him.  *See id.*; Pregent Rep. ¶ 198.  He sustained shrapnel wounds to his right lung and was diagnosed with PTSD, leg injuries, and hearing loss.  *See* S Decl. ¶¶ 6–8.

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter default judgment when a party applies for it.  But the entry of a default judgment "is not automatic."  *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  The Court has an "affirmative obligation" to determine

---

[6]  In his report, Pregent refers to the weapon as "indirect fire," *see* Pregent Rep. ¶ 163, which can include mortars, *see* Hr'g Tr. at 26.  So while his report differs in wording, it is not inconsistent with P's declaration.  And regardless, the Court is satisfied that this attack was propagated with training or other material support from Iran.  *See infra* Part III.A.3.

whether it has subject matter jurisdiction over the matter.  *Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  The Court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a prima facie showing."  *Mwani*, 417 F.3d at 6–7 (cleaned up).

Special procedures govern entry of default when the defendant is a sovereign state. Federal district courts "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity" under FSIA.  28 U.S.C. § 1330(a).  "The Foreign Sovereign Immunities Act . . . affords the sole basis for obtaining jurisdiction over a foreign state in United States courts."  *Mohammadi*, 782 F.3d at 13.  "While the FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . that grant of immunity is subject to a number of exceptions."  *Id.* at 13–14.

The exception relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A.  Section 1605A confers subject matter jurisdiction and recognizes a federal cause of action against foreign states subject to the exception.  *See id.*  Section 1608 then addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state.  *See id.* § 1608.

Different standards of proof govern the Court's personal jurisdiction and subject matter jurisdiction inquiries.  Plaintiffs need only make a "prima facie showing" of personal jurisdiction.  *Mwani*, 417 F.3d at 6–7.  But for the Court to exercise subject matter jurisdiction, Plaintiffs need to "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  The statute does not specify what constitutes "evidence satisfactory to the

court," and the D.C. Circuit has left it to district courts to determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Dem. People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014). "[C]ourts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to . . . differing situations." *Id.* at 1048 (cleaned up). The evidence must consist of "admissible testimony in accordance with the Federal Rules of Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for the Court to come to the "logical conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

## III.   ANALYSIS

First, the Court confirms its subject matter jurisdiction. This analysis considers whether Plaintiffs have carried their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to FSIA. Second, the Court considers whether it has personal jurisdiction over Iran. Third, the Court evaluates whether Plaintiffs have pled a federal cause of action and proven a theory or theories of liability.

### A.   Subject Matter Jurisdiction

"FSIA begins with a presumption of immunity" under 28 U.S.C. § 1330(a). *Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). So to establish subject matter jurisdiction, Plaintiffs bear "the initial burden to overcome [that presumption] by producing evidence that an exception applies." *Id.* Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*

To invoke the terrorism exception to sovereign immunity in 28 U.S.C. § 1605A, Plaintiffs must make two threshold showings. *First*, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor when

the act of terrorism occurred. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs here meet this

requirement as all are U.S. citizens. *See* Compl. ¶¶ 67–265.

     *Second*, the State Department must have designated the foreign government as a state

sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit. *See* 28

U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs meet this requirement because the U.S. State Department

has designated Iran as a State Sponsor of Terrorism since 1984. Compl. ¶ 2.[7]

     Plaintiffs who overcome these threshold showings must then show that their claims fit

within the narrow waiver of sovereign immunity in 28 U.S.C. § 1605A(a)(1). That waiver

contains five requirements:

> [1] money damages are sought against a foreign state [2] for personal injury
> or death [3] that was caused by [4] an act of torture, extrajudicial killing,
> aircraft sabotage, hostage taking, or the provision of material support or
> resources for such an act if such act or provision of material support or
> resources is [5] engaged in by an official, employee, or agent of such foreign
> state while acting within the scope of his or her office, employment, or
> agency.

28 U.S.C. § 1605A(a)(1). The Complaint establishes the first two requirements: Plaintiffs seek

money damages for the injuries to themselves or their family members. *See* Compl. ¶¶ 269–70.

The Court's analysis thus focuses on the latter three requirements, although in a different order.

### 1.    Iran Provided "Material Support" to Terrorist Groups

     Recall that Iran assisted its proxy groups in the form of training, money, safe passage,

and more. *See supra* Part I.A. Plaintiffs and their expert have sufficiently alleged that Iran's

leadership and its Quds Force supported various groups including Shia Special Groups, JTJ,

AQI, and the Taliban in many ways. *See id.* Plaintiffs have thus provided ample evidence

---

[7] *See also State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last accessed December 5, 2022).

"satisfactory to the court," 28 U.S.C. § 1608(e), that Iran materially supported the terrorist

groups and that this support came from an "agent of such foreign state while acting within the

scope of his or her office, employment, or agency," *id.* § 1605A(a)(1).

## 2.    Iran Provided Material Support "For" Extrajudicial Killings

Another requirement of the sovereign immunity waiver is that the nation provide material

support for extrajudicial killings.  *See* 28 U.S.C. § 1605A(a)(1).  "Extrajudicial killing" has the

same meaning as in Section 3 of the Torture Victim Protection Act (TVPA) of 1991.  *See* 28

U.S.C. § 1605A(h)(7).  The TVPA defines an extrajudicial killing as "a deliberated killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C.

§ 1350 note.  "[T]his definition contains three elements:  (1) a killing; (2) that is deliberated; and

(3) is not authorized by a previous judgment pronounced by a regularly constituted court."

*Owens*, 864 F.3d at 770.

Start with the first element, "a killing."  At first blush, that appears to pose a problem

because no Plaintiff died in the attacks.  *See* Compl. ¶¶ 67–265.  But Plaintiffs argue their claims

qualify anyway because courts in this district have found that the term "extrajudicial killing"

encompasses "'deliberated' attempts to kill."  Pls.' Mem. at 14 (quoting *Karcher*, 396 F. Supp.

3d at 58).  The Court agrees for the reasons discussed in *Borochov v. Islamic Republic of Iran*,

589 F. Supp. 3d 15, 32 (D.D.C. 2022).  *Accord Roth*, 2023 WL 196577, at *16.

Plaintiffs thoroughly explained that Iran provided material support to proxy groups in

Iraq and Afghanistan to cause killings.  *See supra* II.A.  For example, Iran trained Shia Special

Groups, JTJ, AQI, and the Taliban to use various weapons—including IEDs, RPGs, VBIEDs,

and more.  *See id.*  These are all lethal explosives engineered to kill targets.  And Iran provided

instruction on military tactics to help proxy groups deploy these weapons more effectively. *See id.* This support strengthened these groups and made them more deadly to Americans. That no Plaintiff died in these attacks was mere fortuity. Indeed, a few Plaintiffs were injured in attacks that killed other servicemembers sitting mere feet from them. *See, e.g.*, C Decl. ¶ 8 (noting that the helicopter's pilot was killed in the attack).

In short, Iran's proxies instigated these attacks with the intent to kill and with material support—including training and weapons—from Iran. None of the attacks injuring Plaintiffs were sanctioned by applicable law. *See* 28 U.S.C. § 1350 note. Thus, Iran gave material support for an extrajudicial killing.

### 3.   Causation

Plaintiffs must show that the attacks were "caused by" Iran's material support to terrorist groups. *Mark v. Islamic Repub. of Iran*, 626 F. Supp. 3d 16, 32 (D.D.C. 2022). But they need not establish a close nexus between Iran's support and the attacks, because financial support and material aid are fungible. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004). Plaintiffs must show proximate cause. *Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40, 61 (D.D.C. 2021).

"Proximate cause requires some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens,* 864 F.3d at 794. To establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions [were] a substantial factor in the sequence of events that led to [their] injury" and that their injury "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (cleaned up).

*The "complex" and signature method attacks:* The causation analysis for Attack #1 is

straightforward.  For starters, the Court found Iran liable for it already in a suit brought by other injured servicemembers.  *See Roth*, 2023 WL 196577, at *17.  More, since Plaintiff's expert submitted his report in *Roth*, new evidence has surfaced that an Iranian-backed terrorist group, JTJ, took credit for this attack.  *See* Pregent Rep. ¶¶ 109–10.[8]  Iran caused this attack.

Attacks #6 and 13 were "complex."  *See* Pregent Rep. ¶¶ 137, 183.  According to Pregent, an attack is complex if it uses several types of weapons, involves reconnaissance or pre-planning, is sustained over time, and more.  *Accord Roth*, 2023 WL 196577, at *17.  Combining multiple weapons systems to inflict casualties and striking along routes heavily trafficked by Americans requires training.  *See id.*  And Iran was the main supplier.  *See id.*; *see also supra* Part I.A.  Iran's training camps instructed on the tactics necessary to successfully inflict casualties in a coordinated way.  *See id.*; *see also supra* Part I.A.

These attacks qualify as complex under Pregent's definition.  Attack #6 included multiple weapons systems—IED and RPG fire.  *See* Pregent Rep. ¶ 137.  So too Attack #13, which involved RPGs and small arms fire.  *See id.* ¶ 183.  More, the Taliban claimed responsibility for this "high-profile attack" on a U.S. helicopter transporting a government contractor.  *See id.* ¶ 184.  Iran caused these attacks, too.

The final two attacks in this category (#3 and 5), involve a signature AQI attack method: a VBIED.  *See id.* ¶¶ 119, 122, 132–33.  According to Pregent, these are "sophisticated attacks requiring expertise that only comes from advanced training."  *Id.* ¶ 132.  More, these attacks both took place in AQI strongholds.  *See id.* ¶¶ 122, 133.  Finally, Attack #3 has a matching SIGACT corroborating the facts the soldier recounts in his declaration.  *See* ECF No. 32-3.  The Court is

---

[8]  Pregent at one point refers to this group as JWJ, *see* Pregent Rep. ¶ 109, but that appears to be a typographical error.

satisfied that Iran caused these attacks.

*All other attacks:*  Typically in FSIA cases brought in this district, courts have before them complex attacks such as Attack #1, *see, e.g.*, *Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 8–9 (D.D.C. 2011), signature weapons, *see, e.g.*, *Karcher*, 396 F. Supp. 3d at 26–30, or a terrorist group publicly claiming responsibility for the attack, *see, e.g.*, *Force v. Islamic Repub. of Iran*, 464 F. Supp. 3d 323, 339 (D.D.C. 2020).

The Court lacks any comparable evidence for the IED, landmine, RPG, rocket, and mortar attacks that injured some Plaintiffs here.  Even so, the Court finds that Plaintiffs have met their burden to show causation for all attacks.

*First*, the IED attacks (Attacks #2, 4, 7, 8, 10, 12, 18, and 19).  As Pregent has explained, IEDs are sophisticated weapons that require training to use properly.  *See Roth*, 2023 WL 196577, at *18.  They also require training to make in the first place, because some are converted mortar and artillery rounds.  *See* Hr'g Tr. at 6.  And Iranian-backed training camps were vital to spreading knowledge about explosives in the years before these attacks.  *See Roth*, 2023 WL 196577, at *18; Pregent Rep. ¶¶ 43–47.  Pregent also noted that successful IED attacks—defined as those inflicting casualties—require training on strategic placement.  *See* Hr'g Tr. at 15; *Roth*, 2023 WL 196577, at *18.  Also necessary is intelligence-gathering about routes American troops are likely to use.  *See Roth*, 2023 WL 196577, at *18.  More, Pregent explained that the group to which he attributed each IED attack had primacy in the relevant region when the attack occurred.  *See* Pregent Rep. ¶¶ 116, 128, 144, 149, 161, 168, 203, 206.  And for some attacks he provides SIGACTs matching the soldier's description, *see* ECF No. 32-6, or other SIGACTs around the attack showing which terrorist group was inflicting damage at that time, *see* ECF Nos. 32-2, 32-

5, 32-7, 32-10, 32-12.  Iran's material support helped cause these attacks.

*Second*, the landmine attack (Attack #14).  While no less devastating than the IED attacks, it proves a closer call for causation.  The Court can find no opinion holding Iran (or any other nation) liable under FSIA for materially supporting a landmine attack.  Nor did counsel offer any such case.  *See* Hr'g Tr. at 36–37.  More, Plaintiff's expert admitted that Russian soldiers had buried landmines in Afghanistan years ago.  *See id.* at 34–36.

Still, Pregent persuasively explained that the Iranian-backed Taliban most likely planted the landmine at issue.  *See id.*  Iran had trained them to properly emplace such weapons to cause lethal explosions.  *See, e.g.*, *id.* at 34.  More, Pregent explained why the landmine could not have been a residual Russian one.  *See id.*  The route containing the landmine was "heavily trafficked," and at the time of the attack the United States had been in the area for four years. *See id*.  If it were years old, it would have already exploded or been removed.  *See id.*  Thus, the most likely explanation is that the Taliban placed it closer in time to the attack, which lines up with their receipt of support from Iran.[9]  *See id.* at 34–36; Pregent Rep. ¶ 187.  The Court is therefore satisfied that Plaintiffs meet their causation burden for this attack.  But it does not mean to suggest that Iran was necessarily responsible for all landmine casualties in the area.

*Third*, the RPG, rocket, and mortar attacks (Attacks #9, 11, 15, 16, and 17).  Similar to IEDs, Pregent explained how each of these weapons requires training to use accurately.  *See Roth*, 2023 WL 196577, at *19; Hr'g Tr. at 6.  Recall that RPGs are shoulder-fired weapons.  *See*

---

[9]  One final note about this attack, and one other that occurred in Afghanistan.  One source Pregent relied on is Executive Order 13224, which states that the Quds Force provided support to the Taliban "since at least 2006."  Pregent Rep. ¶ 179.  Attacks #13 and 14 predate 2006.  *See id.* ¶¶ 183, 186.  Still, the Court is satisfied that Iran's training of the Taliban likely predated 2006 and was a substantial factor in the attacks here, especially #13 which was complex.  *See* Hr'g Tr. at 30–31.  More, Iran recently admitted that it supported the Taliban since the United States invaded Afghanistan in 2001.  *See id.* at 31.

Hr'g Tr. at 18.  As Pregent noted, "[n]ot anyone can pick up an RPG and accurately hit a U.S. moving vehicle."  Hr'g Tr. at 6.  And terrorists often missed their targets, so "a hit is a big deal . . . [and] means there's a level of training."  *Id.* at 20.

So too for rockets and mortars.  These differ from RPGs because they involve a stabilizing base for the mortar system, which is used to launch them from the ground.  *See, e.g.*, *id.* at 23.  Placing the bases requires "preparation" and "perimeter security," other indicia of training and sophistication.  *See id.*  As with the IED attacks, Pregent also located two SIGACTs corroborating two of these attacks.  *See* ECF No. 32-8 (matching Attack #9); ECF No. 30-11 (matching Attack #11).  Plaintiffs adequately prove causation.

In sum, based on Pregent's report and testimony at the hearing, the Court is satisfied that Iran's support was a "substantial factor" in the IED, landmine, RPG, rocket, and mortar attacks and that the consequences of its support were "reasonably foreseeable."  *Accord Roth*, 2023 WL 196577, at *18–19 (finding Iran liable for IED and RPG attacks); *Fissler v. Islamic Repub. of Iran*, No. 18-cv-3122, 2022 WL 4464873, at *5 (D.D.C. Sept. 26, 2022) (finding Iran liable for VBIED attacks); *Stearns v. Islamic Repub. of Iran*, 633 F. Supp. 3d 284 (D.D.C. 2022) (finding Iran liable for mortar and rocket attacks).

### B.   Personal Jurisdiction

Next up is personal jurisdiction.  Personal jurisdiction over a foreign state exists whenever a court has subject matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement

for service between the plaintiff and the foreign state or political subdivision." 28 U.S.C.

§ 1608(a)(1).  The second is "by delivery of a copy of the summons and complaint in accordance

with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2).

Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a

notice of suit . . .  by any form of mail requiring a signed receipt, to be addressed and dispatched

by the clerk of the court to the head of the ministry of foreign affairs of the foreign state

concerned." *Id.* § 1608(a)(3).  And finally, if none of the first three methods works, a plaintiff

can serve the documents through the Department of State. *See id.* § 1608(a)(4).

     The first two methods for serving were unavailable to Plaintiffs.  No special arrangement

governs service of process between the United States and Iran, and Iran is not party to an

international convention on service of judicial documents. *See Borochov*, 589 F. Supp. 3d at 34.

Plaintiffs therefore tried to serve under § 1608(a)(3) by requesting the Clerk of the Court to mail

the summonses and Complaint to Iran by the Postal Service. *See* Cert. of Mailing*,* ECF No. 12.

Iran did not appear or otherwise acknowledge receipt, so Plaintiffs asked the Clerk of the Court

to effect service through the State Department. *See* Aff. Requesting Foreign Mailing, ECF No.

15.  The State Department served Iran in March 2022 through diplomatic channels. *See* Return

of Service, ECF No. 37.  This was sufficient. *Accord Selig*, 573 F. Supp. 3d at 62.

     Because the Court has subject matter jurisdiction and Plaintiffs properly served Iran, the

Court has personal jurisdiction over it.

### C.     Plaintiffs Have Properly Alleged Causes of Action

     FSIA provides plaintiffs with a private cause of action. *See* 28 U.S.C. § 1605A(c).  This

cause of action holds foreign state sponsors of terrorism and their employees or agents liable for

"personal injury or death" to U.S. nationals. *Id.*  But FSIA does not "provide the substantive

basis for plaintiffs' claims." *Ewan v. Islamic Repub. of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020). Plaintiffs need to "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered." *Oveissi v. Islamic Repub. of Iran*, 879 F. Supp. 2d 44, 53–54 (D.D.C. 2012) (cleaned up). Courts "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Repub. of Iran, et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018).

The injured soldiers and contractors label Count 1 as "Injured," but they do not plead a theory of liability for this Count. *See* Compl. ¶¶ 266–70. Courts in this district have applied assault and battery theories of liability to attacks like the ones in this case. Iran is liable for assault if, "when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 21(1)). Iran intended to cause harmful contact and apprehension of that contact because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010). The injured Plaintiffs have submitted substantial evidence about the harm Iran caused them and the fear they experienced during these attacks. The Court finds that Iran is liable for assault.

Iran is liable for battery if "when it committed extrajudicial killing or provided material support and resources therefor, it acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by those attacked and (2) 'a harmful

contact with' those attacked 'directly or indirectly result[ed].'"  *Murphy*, 740 F. Supp. 2d at 74

(quoting Restatement (Second) of Torts § 13).  "Harmful contact is that which results in 'any

physical impairment of the condition of another's body, or physical pain or illness.'"  *Id.*

(quoting Restatement (Second) of Torts § 15).  As has been explained, Iran intended to cause

harmful or offensive contact.  And all injured Plaintiffs stated in their declarations that they

experienced harmful contact during the attacks.  Thus, Iran is liable for battery.

Plaintiff family members bring a claim for solatium.  *See* Compl. ¶¶ 271–74.  Solatium is

"the mental anguish, bereavement and grief that those with a close personal relationship to a

decedent experience as the result of the decedent's death, as well as the harm caused by the loss

of the decedent's society and comfort."  *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp.

3d 107, 140 (D.D.C. 2018) (cleaned up).  Under FSIA, solatium claims are indistinguishable

from claims of intentional infliction of emotional distress (IIED).  *See Valore,* 700 F. Supp. 2d at

85.  Courts have applied the Restatement (Second) of Torts to these claims.  *See, e.g.*, *Abedini v.*

*Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019); *Est. of Hirshfeld*, 330 F. Supp.

3d at 140.

The Restatement sets out four requirements for an IIED claim:  Iran must have (1)

engaged in extreme and outrageous conduct, (2) which was directed at persons other than

plaintiffs, (3) which intentionally or recklessly caused severe emotional distress, (4) to plaintiffs'

immediate family members who were present when such conduct occurred.  *See* Restatement

(Second) of Torts § 46.  The family members satisfy all four requirements.  They meet the first

and third requirements because "acts of terrorism are by their very definition extreme and

outrageous and intended to cause the highest degree of emotional distress."  *Est. of Hirshfeld*,

330 F. Supp. 3d at 141–42 (cleaned up).  They meet the second requirement because the conduct

was directed at the soldiers and contractors, not the family members.  And they meet the fourth requirement because they are immediate family to those injured.  Courts typically waive the requirement that immediate family members be present at the time of the attack when the attackers were terrorists.  *See, e.g.*, *Est. of Hirshfeld*, 330 F. Supp. 3d at 141.  The family members have thus established Iran's liability under the federal private right of action for their solatium claims.

## IV.   DAMAGES

Having established Iran's liability for the attacks, the Court moves to damages.  To obtain damages in this FSIA suit, Plaintiffs must show "that the consequences of [Iran's] acts were reasonably certain to occur" and they must "prove the amount of damages by a reasonable estimate."  *Abedini*, 422 F. Supp. 3d at 136.  The Court has already found that Plaintiffs' physical injuries and emotional suffering were a foreseeable consequence of Iran's actions.  *See supra* Part III.  So the Court now determines whether each Plaintiff's claim for damages is supported by a "reasonable estimate."  *Abedini*, 422 F. Supp. 3d at 136.

Assessing damages for victims of terrorism "is an imperfect science," but "courts strive to maintain consistency of awards between plaintiffs in comparable situations."  *Mark*, 626 F. Supp. 3d at 35 (cleaned up).  Following *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 299 (D.D.C. 2006), courts in this district have coalesced around standard recovery amounts for types of plaintiffs.  *See, e.g.*, *Selig*, 573 F. Supp. 3d at 64.  While *Heiser* is a useful reference, it is not binding.  *See id.*  So courts often vary from its guidelines depending on the facts.  *See, e.g.*, *id.* (collecting cases); *Mark*, 626 F. Supp. 3d at 36–37 (analyzing variances from the *Heiser* framework).

The relevant standards for damages are as follows.  Courts typically award $5 million for pain and suffering from substantial injuries.  *See, e.g.*, *Cohen v. Islamic Repub. of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017).  Substantial injuries include compound fractures, severe flesh wounds, and lasting and severe psychological pain.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 84. Courts vary above or below this amount depending on the extent of the injuries.  For example, victims who endured severe physical or psychological pain, such as losing limbs, vision, or hearing may receive between $7.5–12 million in damages.  *See Mark*, 626 F. Supp. 3d at 35. Yet, victims suffering "severe emotional injury" but "relatively minor physical injuries" typically receive $1.5–3 million.  *Id.*

Judge Howell previously used an "objective metric"—Veterans Affairs disability ratings—to guide her in departing from the *Heiser* awards.  *See Schooley v. Islamic Repub. of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74–75 (D.D.C. June 27, 2019).  This Court recently adopted her approach in *Roth*.  *See Roth v. Islamic Repub. of Iran*, No. 19-cv-2179, 2023 WL 3203032, at *2 (D.D.C. May 2, 2023).  As this Court explained, VA disability ratings are "a specialized agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service."  *Id.*  They facilitate a more objective approach to awarding damages by combining mental and physical injuries into one metric.  *See id.*

The *Schooley* rubric instructs that servicemembers rated up to 30% disabled receive the standard *Heiser* award of $5 million each; those rated between 40–60% disabled receive an upward departure to $6 million each; and those rated 70–100% disabled receive a further upward departure to $7 million each.  *See Schooley*, 2019 WL 2717888, at *75.  Of course, courts remain

free to vary from these benchmarks to "ensure that individuals with similar injuries receive similar awards." *Id.* at *74.

As for the family members of injured servicemembers, the standard amount of solatium damages depends on the nature of the relationship between the victim and the relative, and the severity of pain the relative suffers. *See Mark*, 626 F. Supp. 3d at 35. When a victim suffers a non-fatal injury, courts award spouses $4 million and children $1.5 million on average. *See Moradi v. Islamic Repub. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *Spencer v. Islamic Repub. of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014). Of course, none of these numbers is "set in stone." *Selig*, 573 F. Supp. 3d at 65. Thus, the Court may award greater amounts in cases with "aggravating circumstances" or lower amounts "where the relationship between the claimant and the decedent is more attenuated." *Id.*

### A.   Servicemember and Contractor Damages

Plaintiffs thoroughly detail their injuries and submit medical reports from a doctor. *See* Pls.' Mem. in Support of Damages (Pls.' Damages Mem.), ECF No. 37 (Sealed); *see also* Exs. 37-12–37-30 (medical reports). Based on all this evidence, the Court applies *Schooley*'s rubric with a few alterations to the 19 servicemember and contractor Plaintiffs. *Accord Roth*, 2023 WL 3203032, at *3.

Servicemember Plaintiffs with a VA disability rating greater than or equal to 70%— including G, N, Q, R, H, J, I, B, E, S, O, A, and M—shall receive $7 million each, as they request. *See* Pls.' Damages Mem. at 43. Two servicemembers, K and F, have VA disability ratings of 60%. They shall receive $6 million each, as they request. *See id.*

Plaintiff L, who is 100% disabled according to the VA, requests an upward adjustment from the standard $7 million given his extensive injuries. *See id.* at 46. He lost his left leg, and

suffered injuries to his back, right shoulder, right hip, and both knees.  *See* L Decl. ¶¶ 9–10.  He

was also diagnosed with PTSD, hearing loss, and tinnitus.  *See id.*  He submits a life care plan

that projects his future medical costs to be over $5 million.  *See* Life Care Plan, ECF No. 37-25.

L requests that these costs be added to his baseline award, for a total of $12,697,511.  *See* Pls.'

Damages Mem. at 47.

Mindful of the need to standardize awards for Plaintiffs with similar injuries, the Court

finds that award excessive.  *Accord Borochov*, 589 F. Supp. 3d at 41 ("In the interest of fairness

. . . courts strive to maintain consistency of awards between plaintiffs in comparable situations."

(cleaned up)).  Even awards at the high end of the *Heiser* framework seldom exceed $12 million.

*See, e.g.*, *Cabrera v. Islamic Repub. of Iran*, No. 19-cv-3835, 2022 WL 2817730, at *45–46

(D.D.C. July 19, 2022).  More, the Court intends its awards to be fully compensatory—they

reflect both the injuries suffered and medical costs.

Still, L persuasively contends that he suffered injuries that deserve more than the usual $7

million for 100% disabled veterans.  *See* Pls.' Damages Mem. at 46–47.  Traumatically, he lost

his left leg "instantly" when he stepped on a landmine.  L Decl. ¶ 7.  And he suffers from

tinnitus, plus injuries to his back and hip.  *See id.* ¶ 8.  More, L details his ongoing struggle with

PTSD, which has caused him to experience frequent panic attacks and constant anxiety.  *See id.* ¶

10.  He will also face significant medical costs for the rest of his life.  *See* Life Care Plan.  Thus,

in line with prior awards to similarly situated Plaintiffs, the Court will award L $9 million.

*Accord Roth*, 2023 WL 3203032, at *3 (awarding same amount for amputees with projected

future medical costs above $14 million); *Cabrera*, 2022 WL 2817730, at *45 (same for amputees

with lengthy hospital stays).  While no monetary award can make L whole, the Court finds that

$9 million is reasonable compensation given his injuries and future medical costs.

Three Plaintiffs—D, P, and C—do not have VA disability ratings.  D and P both suffered substantial injuries, so they shall receive $5 million each.  *See* Pls.' Damages Mem. at 44.  C—a government contractor—argues she should receive an upward adjustment to $7 million for her more extensive injuries.  Recall that she was shot three times in the torso and once in the leg.  *See* C Decl. ¶ 8; Medical Report on C, ECF No. 37-29.  After the attack, she was airlifted to several facilities for emergency medical care.  *See* C Decl. ¶¶ 9–10.  She now lives with "severe and permanent injuries" to her right leg and back.  *Id.* ¶ 11.  She also has hearing loss, foot pain, and PTSD.  *See id.*  The Court agrees that an upward adjustment to $7 million is appropriate.

### B.  Family Member Damages

Family members of the injured servicemembers and contractors seek solatium damages.  Recall that courts in this district consult the *Heiser* framework because such awards are difficult to quantify.  *See supra*.  Three spouses seek $4 million each, and 13 children seek $1.5 million each for emotional injuries—the standard amounts under *Heiser*.  *See* Pls.' Damages Mem. at 47–48; *see also* ECF Nos. 37-1–37-10 (family member declarations).  The Court finds that these family member Plaintiffs show they are entitled to these awards.  *Accord Roth*, 2023 WL 3203032, at *4 (awarding spouses of injured servicemembers $4 million each and children $1.5 million each).

### C.  Punitive Damages

Plaintiffs also seek punitive damages.  *See* Pls.' Damages Mem. at 49–52.  Such damages help "punish outrageous behavior and deter [it] in the future."  *Selig*, 573 F. Supp. 3d at 75.  Four factors guide awarding punitive damages.  *See id.*  These are: (1) the character of the defendant's acts, (2) the nature and extent of harm to the plaintiffs that the defendant caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendant.  *See id.*  These factors

support an award of punitive damages.  Iran's terroristic acts were intended to—and did—cause severe pain and suffering to Plaintiffs.  More, "[t]here is need for deterrence because, time and again, courts in this district have been confronted with families shattered by Iran-backed terrorists."  *See id.*

As Plaintiffs note, "courts have used different methods to arrive at final punitive awards." Pls.' Damages Mem. at 49.  They invoke the multiplier approach from *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 42 (D.D.C. 2016), which would award them $3.44 for each compensatory dollar, *see* Pls.' Damages Mem. at 51–52.  True, some courts in this district have adopted this approach. *See, e.g.*, *Gill v. Islamic Repub. of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017).  But other courts—including this one—have rejected it because it leads to punitive damages that far exceed compensatory damages.  *See, e.g.*, *Roth*, 2023 WL 3203032, at *5; *Selig*, 473 F. Supp. 3d at 75–77; *Christie v. Islamic Repub. of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *28 (D.D.C. July 2, 2020).

As this Court explained in *Selig*, awarding punitive damages equal to compensatory damages "is commensurate with the character of [Iran's] [terroristic] acts and the nature and extent of the harm caused."  573 F. Supp. 3d at 77.  For the reasons discussed more fully in *Selig*, the Court will award punitive damages equal to compensatory ones—$160,500,000 to be apportioned among Plaintiffs according to their compensatory damages.  *See id.*  *Accord Roth*, 2023 WL 3203032, at *5; *Borochov*, 589 F. Supp. 3d at 49.[10]

---

[10] Plaintiffs also seek attorneys' fees and reimbursement for unspecified "costs and expenses." Compl. at 40.  Plaintiffs cite no basis for the award of these fees.  *See Kinyua v. Repub. of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees[.]").  More, "plaintiffs have not provided any information regarding the fees and costs sought."  *Selig*, 573 F. Supp. 3d at 78 (denying plaintiffs' request for costs and expenses because "plaintiffs have not provided any information regarding the fees and costs sought").  The Court therefore declines to award any fees or expenses.

\* \* \*

In closing, the Court reiterates what it has stated elsewhere in FSIA cases, that no one should experience the trauma that Plaintiffs here undoubtedly experienced.  Iran's systematic terroristic targeting of U.S. personnel serving in third countries is reprehensible.  In making these awards, the Court does not minimize or denigrate the pain and suffering each Plaintiff has endured.  The Court's duty is to seek to achieve some justice and consistency not only between Plaintiffs here, but in line with other awards that have been made to similarly injured plaintiffs in prior FSIA cases.  *Accord Borochov*, 589 F. Supp. 3d at 48.

## V.    CONCLUSION

For these reasons, the Court will grant in part Plaintiffs' Motion for Default Judgment. But the Court denies the motion when its damages requests differ from those discussed.  A separate Order will issue today, including an appendix with Plaintiffs' total damages.


Dated: July 27, 2023                                    _____

                                                        TREVOR N. McFADDEN, U.S.D.J.